STRANCH, J., delivered the opinion of the court in which BLACK, D.J., joined, and CLAY, J., joined in part. CLAY, J. (pp. 554-59), delivered a separate opinion concurring in part and dissenting in part. OPINION JANE B. STRANCH, Circuit Judge. Lowell Phillips, then a Ferndale Police Officer, ended a car chase on the outskirts of Detroit by ramming Laszlo Latits’s car off the road and then shooting and lolling Latits as he tried to resume flight. Latits’s widow sued former Officer Phillips under 42 U.S.C. § 1983 alleging that Phillips’s actions violated the Fourth Amendment. The district court granted summary judgment to Phillips, concluding that the shooting was reasonable. We determine that Phillips’s use of deadly force was objectively unreasonable, in violation of the Fourth Amendment. Caselaw existing at the time of the events, however, did not clearly establish the objective unreasonableness of Phillips’s actions in the circumstances of this case. Phillips is therefore entitled to qualified immunity and we must AFFIRM. I, BACKGROUND The events of this case were recorded by video cameras mounted on the dashboards of four separate police cars. Consequently, we describe the facts “in the light depicted by the videotape.” Scott v. Harris, 550 U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Because this appeal arises from the Defendant’s motion for summary judgment, we view any relevant gaps or uncertainties left by the videos in the light most favorable to the Plaintiff. See Godawa v. Byrd, 798 F.3d 457, 463 (6th Cir. 2015) (accepting the plaintiffs version of the facts because they were not “clearly contradicted]” by the video). Facts are also provided by deposition testimony and other evidence presented in the district court. After midnight on June 24, 2010, Fern-dale Police' Officer Kenneth Jaklic stopped Latits for turning the wrong way onto a divided boulevard. Jaklic approached the car with a flashlight. Latits produced his driver’s license and opened his glove box to retrieve his registration and insurance documents. Officer Jaklic testified that inside the box he saw one or more bags that he suspected to contain marijuana and a pill bottle, all of which Latits attempted to move under the passenger seat. Jaklic testified thát he then told Latits to get out of the car. The video recorded by the officer’s dashboard camera shows that Jaklic took out his gun about eight seconds after walking up to the car, and then stood at La-tits’s window shining his flashlight into the car and pointing the gun at the ground for about thirty seconds. Officer Jaklic then raised his gun and pointed it at Latits’s head at point-blank range. Latits drove away, and Jaklic ran back to his police car to pursue him. Officer Jaklic broadcast that he was pursuing a fleeing vehicle and other officers headed in that direction to join the chase. Jaklic announced that he was chasing a suspect for a traffic violation and possible health code violation, including “stashing some narcotics underneath his chair.” After fleeing from Jaklic for nearly two minutes (during which time Latits’s car cannot be seen clearly on video), Latits entered an empty parking lot. Officer Jaklic’s car entered the parking lot and slowly moved into the path of Latits’s car, at which time Latits can be seen steering away from Jaklie’s car to avoid colliding. Officer Jaklic then broadcast that Latits “tried to ram my vehicle.” Another officer can be heard asking to clarify whether Latits rammed the patrol car, to which Jaklic responded: “He tried to.” At his deposition, Officer Jaklic admitted that Latits in fact turned his wheel and got out of the way to avoid hitting the patrol car. At the moment of the near miss of the cars of Latits and Jaklic, the dashboard camera of the Defendant, Officer Phillips, shows that the parking lot where Latits was located was just ahead of Phillips. The district court determined that a reasonable jury could find from the video that Officer Phillips could see that Latits did not try to ram Jaklic and therefore knew that Officer Jaklie’s statement otherwise was false. After avoiding Officer Jaklie’s car, Latits fled the parking lot, turning south on to a ten-lane divided highway. Three officers were now chasing close behind Latits: Officer Andrew Wurm first, Officer Jaklic second, and Officer Phillips third.[1] All three had dashboard cameras recording their perspectives of the chase. For approximately thirty seconds, Latits led the three officers southbound down the highway at about sixty miles per hour, passing through two red lights. No pedestrians or other cars are visible on the nighttime highway except one parked car two lanes away from Latits. The highway was bounded by a cemetery on one side and a commercial zone and vacant state fairgrounds on the other. ■ Latits next attempted to make a U-turn but partially ran over the curb of the grassy highway median. Wurm, still the first officer behind Latits, also attempted to make the U-turn, and collided with the rear driver’s side of Latits’s car.[2] Officer Wurm then broadcast over the police radio: “Oh, I just hit him.” Officer Phillips was following shortly behind Officers Wurm and Jaklic, and the district court determined that a jury could find that Phillips knew that Wurm’s car hit Latits’s car. As the cars tried to reorient on the highway, Officer Wurm again collided with the rear of Latits’s car, at which time an officer (presumably Wurm) can be heard exclaiming: “Shit!” Officer Phillips, close behind Wurm and Jaklic, could see Wurm hit Latits a second time. An officer can then be heard saying: “This guy’s all over the road, he’s hit me several times.” The videos, however, show that Latits had not hit any police cars; rather, he had turned to avoid hitting Officer Jaklic and had been hit twice by Officer Wurm. The two impacts by Officer Wurm’s car apparently caused Latits to lose control of his car, which swerved to the right and then back left across three lanes. No pedestrians or cars besides those of Latits and the officers are visible on the video during this time. Latits’s car then straightened out and traveled northbound for nearly five seconds. While Latits was swerving, Officer Phillips sped past Officers Jaklic and Wurm and, nearly five seconds after Latits’s car had straightened out, Phillips rammed Latits’s car from the back left, pushing it across two lanes of traffic and off the road.[3] Officer Phillips’s ramming caused Latits’s car to spin out onto an area of grass and concrete to the right. ' When Latits’s car stopped it was parallel and to‘the right of Officer Phillips’s car. Officer Wurm pulled onto the grass parallel to the opposite side of Latits’s car. Latits slowly began to drive forward through the opening between the cars of Phillips and Wurm, while Officer Jaklic slowly drove towards the same opening from the opposite direction in an apparent attempt to block it. Latits’s and Jaklic’s ears then had a very low-speed head-on collision. Officer Jaklic testified that he was hot injured and his police car suffered minimal damage to the push bar on its front end. At about the same time, Officer Phillips jumped out of his car and ran toward Latits’s car from behind it.[4] Phillips was alongside 'Latits’s front passenger-side door when Latits started reversing away from Officer Jaklic’s car.[5] Latits’s car can be seen reversing past Officer Phillips and out' of the frame of one dashboard camera with Phillips following on foot. One second later, Latits’s car can be seen reversing’ into the frame of Phillips’s dashboard camera, and what is apparently gunshots can be heard. Latits’s car rolls to a stop as Phillips enters the frame with' his gun raised. The dashboard camera of a fourth officer arriving at the time Latits was shot shows that no cars or persons were imihe-diately behind Latits as he reversed. Officer Phillips, following in the same direction-in which Latits was reversing, could see that no one was in Latits’s direct path. Seven shell casings were recovered from the scene matching Officer Phillips’s gun.[6] Latits was struck by three bullets and died at the hospital later that morning. The autopsy reported that the direction of the gunshot wounds to Latits’s chest and abdomen were from the front to back. Less than four minutes passed from the time Latits first drove away from Officer Jaklic to the time he was shot by Officer Phillips. Phillips was terminated for his conduct during the pursuit that ended in the shooting death of Latits. Among 'the reasons for Phillips’s termination, the Ferndale Chief of Police cited the following violations of police policy: Phillips engaged in vehicular pursuit as the third police car without permission, passed the secondary and primary vehicles in the pursuit, used a PIT maneuver in violation of a direct order, and ran up to Latits’s car -instead of taking a tactical position using his vehicle as cover. ' The Plaintiff sued under 42 U.S.C. § 1983 alleging that Phillips’ violated La-; tits’s clearly established Fourth Amendment rights by using deadly force to terminate the chase. The district court granted summary judgment to Phillips, concluding that his use of deadly force was objectively reasonable. Latits timely appealed. II. ANALYSIS A. Standards of Review We review grants of summary judgment de novo, viewing the facts in the light most favorable to. the non-moving party. Godawa, 798 F.3d at 462. To the extent that videos in the record, show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos. See Harris, 550 U.S. at 380, 127 S.Ct. 1769. To the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party. See Godawa, 798 F.3d at 463. Summary judgment is appropriate if the materials in the record show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Id. at 462. This suit implicates the doctrine of qualified immunity. Public officials are entitled to qualified immunity from suits for civil damages if either the official’s conduct did not violate a constitutional right or if that right was not clearly established at the time of the conduct. Id. at 462-63. (citing Saucier v. Katz, 533 U.S. 194, 201-02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Courts may consider those two inquiries in either order. Id, (citing Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct, 808, 172 L.Ed.2d 565 (2009)). B. Whether a Constitutional Right Was Violated The Fourth Amendment’s prohibition against unreasonable seizures protects citizens from excessive force by law enforcement officers. Id. at 463. While officers may? use some degree of physical coercion to make -an arrest, the Fourth Amendment requires the amount of force to be objectively reasonable under the totality of the particular circumstances. Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Among the factors analyzed to determine the constitutionally. permissible amount of force are “the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Id. The reasonableness inquiry is an objective one, considered from the perspective of a hypothetical reasonable officer in the defendant’s position and with his knowledge at the time, -but without regard to the actual defendant’s subjective intent when taking his actions. Id. at 397, 109 S.Ct. 1865. The court must avoid “the 20/20 vision of hindsight,” recognizing that officers in tense and evolving situations may have to .make a split-second decision about the amount of force that is necessary. Id, at 396-97, 109 S.Ct. 1865. The reasonableness analysis thus includes some “built-in measure of deference to the officer’s on-the-spot judgment.” Mullins v. Cyranek, 805 F.3d 760, 766 (6th Cir. 2015) (citations omitted). At the same time, the “fact that a situation unfolds quickly does not, by itself, permit officers to use deadly force. Rather, qualified immunity is available only where officers make split-second decisions in the face of serious physical threats -to themselves and others.” Id. at 766-67 (internal quotation marks, brackets, and citations omitted). ‘ As á general rule, the Fourth Amendment prohibits' the use of deadly force to prevent the escape of fleeing suspects unless “the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.” Tennessee v. Garner, 471 U.S. 1, 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Of the three non-exclusive factors listed in Graham, “the threat factor is ‘a minimum requirement for the use of deadly force.’ ” Mullins, 805 F.3d at 766 (quoting Untalan v. City of Lorain, 430 F.3d 312, 314 (6th Cir. 2005)); see also Ciminillo v. Streicher, 434 F.3d 461, 468 (6th Cir. 2006) (stating that a person has a “right not to be shot unless they are perceived as posing a threat to officers or others”). The Sixth Circuit has developed “a consistent framework in assessing deadly-force claims involving vehicular flight.” Cass v. City of Dayton, 770 F.3d 368, 375 (6th Cir. 2014). The “critical question” is whether the officer had objective “ ‘reason to believe that the [fleeing] car presents an imminent danger’ to ‘officers and members of the public in the area.’ ” Id. (quoting Smith v. Cupp, 430 F.3d 766, 775 (6th Cir. 2005)). Deadly force is justified against “a driver who objectively appears ready to drive into an officer or bystander with his car,” but generally not “once the car moves away, leaving the officer and bystanders in a position of safety,” unless “the officer’s prior interactions with the driver suggest that the driver will continue to endanger others with his ear.” Id. (citations omitted). The Sixth Circuit has found deadly force justified by prior interactions demonstrating continuing dangerousness only when the “suspect demonstrated multiple times that he either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around.” Cupp, 430 F.3d at 775 (characterizing the suspects in both Scott v. Clay Cty., 205 F.3d 867, 872 (6th Cir. 2000), and Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992)). To determine whether Latits presented an imminent danger to officers or the public at the time Officer Phillips shot him requires analysis of both the moments before the shots were fired and the prior interactions between Latits and Phillips. Just before the shots, the videos show that Latits reversed past Phillips before Phillips raised his gun and before gunshots can be heard. In Hermiz v. City of Southfield we stated that: “A reasonable jury drawing inferences in the estate’s favor could determine that an officer that aimed and fired shots while to the side of the vehicle,” after “the hood of [the suspect’s] car already passed the point where it could harm [the officer],” “would have had time to realize that he was no longer in the path of the car and no longer in immediate danger.” 484 Fed.Appx. 13, 16 (6th Cir. 2012). Likewise, because Officer Phillips fired after Latits’s car had passed the point where it could harm him, Phillips had time to realize he was no longer in immediate danger. The evidence also shows that Officer Phillips could see that no other officers or other persons were in Latits’s path when Phillips fired. Latits was reversing away from Officers Jaklic and Wurm, who were in front of him and to his left, respectively. Officer Danielson’s dashboard camera shows that Phillips’s car was between her car and Latits’s car at the time of the shooting, so Latits was reversing away from her as well. There were no other officers on the scene, and there is no evidence or suggestion by the Defendant that members of the public were in the immediate path of Latits’s car. Cf. Cupp, 430 F.3d at 774 (finding deadly force unreasonable where the “record does not establish the presence of any bystander ... whose physical safety could have been endangered by [the driver’s] actions”). The videos displaying Officer Phillips’s position show that he could see that no persons or cars were in the immediate path on which Latits was traveling. Phillips testified that after colliding with Officer Jaklic’s car, Latits looked directly back at him, rewed his engine, and moved the car towards Phillips, at which time Phillips fired his weapon. The video evidence, however, contradicts this testimony and we view the evidence in the light depicted by the video. See Harris, 550 U.S. at 381, 127 S.Ct. 1769. Furthermore, the record includes no evidence suggesting that by continuing to reverse, Latits’s intention was anything except to flee. Given the above analysis, Latits did not objectively appear ready to drive into someone when Officer Phillips shot him. Several of our cases have concluded that deadly force was objectively unreasonable when the officer was to the side of the moving car or the car had already passed by him—taking the officer out of harm’s way—when the officer shot the driver. Godawa, 798 F.3d at 466-67; Hermiz, 484 Fed.Appx. at 16; Sigley v. City of Parma Heights, 437 F.3d 527, 531, 537 (6th Cir. 2006); Cupp, 430 F.3d at 774-75. But the fact that no one was in the car’s direct path at the time the driver was shot does not end the analysis. Cass, 770 F.3d at 376 (“[T]he inquiry is not nearly so narrow.”). We must also look to the prior interactions between Latits and Officer Phillips and the potential of imminent danger to other officers or members of the public in the area. See id. Because it is undisputed that Latits was fleeing to avoid arrest, we turn to the Graham factor that analyzes the severity of the crime at issue. Officer Phillips knew from Officer Jaklic’s broadcast that Latits was originally suspected of possessing narcotics—not a violent crime. The second Graham factor asks if the individual poses an immediate threat to the safety of an officer or others. The videos show that Officer Phillips first observed Latits’s car as it was turning to avoid Officer Jaklic’s car; the district court determined that Phillips could see that Latits did not try to ram Jaklic’s car. Latits then fled at no more than sixty miles per hour down an almost entirely empty ten-lane divided highway at night. In his pursuit of Latits, Phillips passed only one parked car, and no other pedestrians, cyclists, or non-police cars are visible on Phillips’s dashboard camera for the remainder of the chase. The videos make clear that Phillips observed Latits drive partially over a grassy median, attempting a U-turn, and then saw Officer Wurm’s car hit Latits’s car twice, and that Latits did not ram Officer Wurm. Phillips then observed Latits swerve across the empty highway, which was bordered by a cemetery and largely vacant state fair grounds. As Officer Phillips sped past the two officers preceding him in the pursuit (in violation of department policy), he could observe that Latits was able to straighten his car for about five seconds before Phillips rammed him off the road (also in violation of department policy and a direct order). Up to the point when Latits’s car came to a stop after Officer Phillips rammed it off the road, Latits had shown no intent to injure the officers. Though Latits did briefly lose control and swerve after Wurm hit him twice (for which Officer Wurm was disciplined for violating department policy), there were no members of the public nearby to be endangered and Latits appeared to regain control of his car before Officer Phillips rammed him. Finally, after Latits’s car had come to a stop off the road, Officer Phillips observed Latits slowly drive forward and collide with the front of Officer Jaklic’s car. However, the video permits the reasonable interpretation that this collision was accidental, in which case it would provide less justification for deadly force. See Sigley, 437 F.3d at 536; Vaughan v. Cox, 343 F.3d 1323, 1330 (11th Cir. 2003) (holding that a collision with a police-car that could be viewed by a jury as accidental did not automatically justify deadly force); cf. Godawa, 798 F.3d at 463 (finding that deadly force was unreasonable because a jury could determine that the officer initiated the impact with the driver’s car rather than the driver intentionally targeting the officer). - Moving forward through the gap between the cars of, Phillips arid Wurm, Latits was not facing head-on with Officer Jaklic’s ear until one to two seconds before their impact, likely too late for either car to avoid the low-speed collision, Viewing the video in the light most favorable to the Plaintiff, the slow collision reveals intent to flee, not intent to injure officers. Whether a fleeing suspect showed objective intent to injure officers is relevant to whether the suspect presented sufficient: danger to justify deadly force. See Sigley, 437 F.3d at 536 (reversing a grant of summary judgment where it was not clear whether the suspect “intended to injure” others). The videos additionally reveal that Latits did not commit felonious assault, which is also relevant to the Graham, factor addressing the severity of the crime. See Godawa, 798 F.3d at 466 (reversing the district court for not viewing the evidence in the light most favorable to the Plaintiff when considering which crimes the fleeing driver had committed). Permitting Latits to continue to flee instead of shooting him would not have put the public in imminent danger either. The chase occurred under circumstances in which risk to the public was relatively low. Latits- drove at a maximum of sixty miles an hour on a large, effectively empty highway surrounded by non-populated areas (a cemetery and vacant state .fairgrounds), passing no pedestrians, cyclists, or motorists besides the police trailing him. Cf. Walker v. Davis, 649 F.3d 502, 503 (6th Cir. 2011) (affirming the denial of summary judgment to officer who rammed and killed a motorcyclist leading police on a five-minute- chase at sixty miles per hour through a red light down an empty highway in rural Kentucky). Latits’s flight was on an effectively empty highway; he had shown no intention or willingness to drive recklessly through residential neighborhoods. Altogether, Latits’s conduct prior to being shot, when viewed in the light most favorable to the Plaintiff, showed a persistent intent to flee but not an intent to injure, and never placed the public or the officers at imminent risk. We must, however, also view the facts with due deference to the quick decisions Officer Phillips- had to make in a tense, uncertain, and rapidly evolving situation. Graham, 490 U.S. at 396-97, 109 S.Ct. 1865. Phillips testified that he subjectively believed Officer Jaklic’s broadcast that La-tits had tried to ram Jaklic’s car, and thought Latits was trying to ram'an officer a second time when he saw Latits’s car collide with Jaklic’s car about five seconds before Phillips fired at Latits. “We have previously held that ‘[wjithin a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed.’ ” Mullins, 805 F.3d at 767 (quoting Untalan, 430 F.3d at 315). But we must undertake an bbjective analysis, viewing the evidence in the light most favorable to Latits, as we have done above. Thus, both Mullins and Untalan, in which we held that deadly force was reasonable because a dangerous situation had evolved into a safe one before the officers had a chance to realize the change, are distinguishable. There officers were engaged in physical, hand-to-hand confrontations:with a suspect who moments before being shot had held a gun or knife. Id.; Untalan, 430 F.3d at 315. Here, Officer Phillips’s life was never in imminent danger, and, under the objective analysis of Latits’s slow collision with Officer Jaklic’s car, no other officer’s life was endangered in the moments before Phillips fired. Furthermore, the short time between the collision with an officer’s vehicle and the shooting does not, by itself, justify deadly force. In Godawa, for example, we held that it was unreasonable for the officer to shoot at the driver two seconds after the officer had contact with the driver’s car, even though the. officer subjectively believed the driver had just targeted and assaulted him with his car. 798 F.3d at 466; see also Cupp, 430 F.3d at 775 (“The fact that this was a rapidly evolving situation does not, by itself, permit him to use deadly force.”). If the shock of a collision to the officer was insufficient on its own to justify deadly force in Godawa, such shock alone is also insufficient here, particularly where Latits collided with a different officer than the one who shot him. Phillips also argues that some level of recklessness permits deadly force even without the driver’s intent to injure or ram, because extremely reckless driving can create the imminent threat to others that can .justify deadly force. See, e.g., Plumhoff v. Rickard, — U.S. —, 134 S.Ct. 2012, 2017-18, 2021-22, 188 L.Ed.2d 1056 (2014); Harris, 550 U.S. at 379-80, 384, 127 S.Ct. 1769. But Supreme Court and Sixth Circuit precedent finding deadly force reasonable to end a car chase is distinguishable because those cases involved significantly more dangerous prior conduct by the driver, imminent risk of harm to an identifiable party, or objective evidence of the driver’s intent to harm officers. In several cases, the suspects demonstrated obvious willingness to endanger the public by leading the police on chases at very high speeds and through active traffic. See Plumhoff, 134 S.Ct. at 2017, 2021-22 (suspect swerved through traffic at over 100 miles per hour, passing more than two dozen vehicles and forcing several to alter their course); Harris, 550 U.S. at 375, 379-80, 127 S.Ct. 1769 (suspect sped down narrow two-lane roads at over 85 miles per hour swerving around more than a dozen cars on both sides of the double-yellow line, forcing ears on both sides to the road shoulder); Clay Cty., 205 F.3d at 872 (suspect led police on twenty-minute chase up to 100. miles per hour, forcing , a motorist, off the road); Freland, 954 F.2d at 344 (suspect fled at over 90 miles per hour and ultimately crashed into a stationary police car). In other cases, officers fired only after seeing another officer on foot in imminent danger of being injured by the suspect’s car or already actually struck by the suspect’s car. See Cass, 770 F.3d at 372-73, 376 (officers fired after suspect’s car struck both of them, knocking one down); Hocker v. Pikeville City Police Dep’t, 738 F.3d 150, 151, 153 (6th Cir. 2013) (suspect collided with police car while an officer was standing next to it, the officer’s arm became trapped in the police car’s door and he was forced to backpedal as the suspect’s car pushed the officer’s car, at which time another officer on the scene fired); Williams v. City of Grosse Pointe Park, 496 F.3d 482, 484 (6th Cir. 2007) (officer who had his arm through the suspect’s , car window was knocked down as the suspect’s car accelerated, at which time another officer fired). Finally, some cases featured suspects who officers reasonably believed to be carrying guns that they were willing to fire at officers (in addition,to .highly reckless. , driving). See Mullenix v. Luna, — U.S. —, 136 S,Ct. 305, 306, 309, 193 L.Ed.2d 256 (2015); Dudley v. Eden, 260 F.3d 722, 724, 727 (6th Cir. 2001). Phillips argues that this case is' comparable, to Plumhoff, Hocker, Williams, and Freland. As explained above, these cases are distinguishable. In sum, considering the totality of the circumstances in the light depicted by the video and otherwise most favorable to the Plaintiff, we conclude that Latits did not present an imminent or ongoing danger and therefore that the shooting was not objectively reasonable. In addition, although police procedures do not set the bounds of the Fourth Amendment, we consider it relevant that Officer Phillips repeatedly violated police procedures in both ramming Latits and running up to his car. See Mullins, 805 F.3d at 768 (“Whether or not an officer is following police procedures is certainly relevant to the question of reasonableness in excessive force cases, but it is not necessarily conclusive proof that the Constitution has been violated.”). For these reasons, we conclude that Officer Phillips’s use of deadly force was objectively unreasonable and in violation of Latits’s constitutional rights.[7] C. Whether that Right was Clearly Established Even if Officer Phillips violated Latits’s constitutional right, he is entitled to qualified immunity if that right was not clearly established at the time of the violation—June 2010. “A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.” Mullenix, 136 S.Ct. at 308 (citation and internal quotation marks omitted). For this to occur, “existing precedent must have placed the statutory or constitutional question beyond debate.” Id. (citation omitted). The precedent clearly establishing a right can be in the form of a case of “controlling authority or a robust consensus of cases of persuasive authority.” Plumhoff, 134 S.Ct. at 2023 (citation and internal quotation marks omitted). The Supreme Court has instructed that the question that must be beyond debate is a specific one: Was the “particular conduct” violative “in light of the specific context of the case.” Mullenix, 136 S.Ct. at 308 (citations omitted); see also Bolick v. City of E. Grand Rapids, 580 Fed.Appx. 314, 320-21 (6th Cir. 2014) (“[W]e must define the rights at issue ‘at the appropriate level of generality—a reasonably particularized one.’ ” (quoting Hagans v. Franklin Cty. Sheriff’s Office, 695 F.3d 505, 509 (6th Cir. 2012))). Stating that clearly established law “does not require a case directly on point,” the Supreme Court recently reversed a denial of qualified immunity because the lower court “failed to identify a case where an officer under similar circumstances ... was held to have violated the Fourth Amendment.” White v. Pauly, — U.S.—, 137 S.Ct. 548, 551-52, 196 L.Ed.2d 463 (2017) (citation and brackets omitted). Accordingly, we look to controlling authority, extant at the time of the violation, entailing similar conduct and circumstance. The Plaintiff has not identified any case-law where an officer, under sufficiently similar circumstances was held to have violated the Fourth Amendment, and neither have we. The Plaintiff relies on Sigley and Cupp to argue that Phillips violated clearly established law. The dissent also argues that Sigley and Cupp had clearly established by 2010 that Phillips’s conduct was unconstitutional. We have held that, as of 2007, Sigley and Cupp had clearly established that “shooting a driver while positioned to the side of his fleeing car violates the Fourth Amendment, absent some indication suggesting that the driver poses more than a fleeting threat.” Hermiz, 484 Fed.Appx. at 17.[8] But Sigley and Cupp are distinguishable from this ease in a material way: Those cases involved officers confronting a car in a parking lot and shooting the non-violent driver as he attempted to initiate flight. See Sigley, 437 F.3d at 530-31; Cupp, 430 F.3d at 769-70. Here, Phillips shot Latits after Latits led three police officers on a car chase for several minutes—during which Latits repeatedly sought to evade capture—an important factual distinction that sets this case apart from Sigley and Cupp.[9] This case presents a close call, but in light of the Supreme Court’s recent analyses in Mullenix and Pauly, these cases do not suffice. They did not involve many of the keys facts in this case, such as car chases on open roads and collisions between the suspect and police cars. Accordingly, although we now hold that Phillips’s conduct fell outside the bounds of the Fourth Amendment, controlling authority at the time of the events had not clearly established the rights we identify today. Although it is relevant to the first prong of the qualified immunity analysis, see supra Part II.B at 13, Phillips’s violation of Ferndale Police Department policies does not require a different outcome. “[T]he fact that an officer’s conduct merely violates a departmental policy does not cause that officer to lose their qualified immunity.” Bell v. City of E. Cleveland, 125 F.3d 855 (6th Cir. 1997) (citations omitted); see also City & Cty. of San Francisco v. Sheehan, — U.S.—, 135 S.Ct. 1765, 1777, 191 L.Ed.2d 856 (2015) (“Even if an officer acts contrary to her training, however ... that does not itself negate qualified immunity where it would otherwise be warranted.”); Russo v. City of Cincinnati, 953 F.2d 1036, 1044 (6th Cir. 1992) (“[T]he Supreme Court has indicated that the violation of established procedure alone is insufficient to overcome a qualified immunity claim.” (citing Davis v. Scherer, 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984))). It must have been clearly established that the conduct at issue violates the Constitution, not internal policies. This case establishes important constitutional parameters. At the time of the actions of Officer Phillips, however, it cannot be said that existing precedent made it clear to reasonable officials that what Phillips did violated the Fourth Amendment. Thus, this case fails to satisfy the “clearly established” prong of the qualified immunity doctrine. III. CONCLUSION We hold that Officer Phillips’s conduct was objectively unreasonable and in violation of the Fourth Amendment. Its unreasonableness, however, was not clearly established at the time of Officer Phillips’s actions, and he is therefore entitled to qualified immunity. For that reason, we must affirm.[10] CONCURRING IN PART AND DISSENTING IN PART . The Plaintiff submitted evidence to the district court (from a deposition in another case in which the Ferndale Chief of Police discussed Officer Phillips’s role in the events of this case) that Ferndale Police Department policy prohibits more than two police cars from actively pursuing a fleeing car without special permission. The Ferndale Chief of Police testified that Officer Phillips violated department policy by joining the pursuit as the third police car without the required permission. . Officer Wurm received a written reprimand for intentionally striking the suspect vehicle during the pursuit in violation of Ferndale’s chase policy, according to the Ferndale Chief of Police. . This was a so-called PIT maneuver. PIT maneuvers were against Ferndale policy, -and the Chief of Police had specifically ordered Officer Phillips never to use a PIT maneuver. . The Ferndale Chief of Police testified that Officer Phillips violated department procedures by running to the suspect vehicle instead of taking a tactical position using his vehicle as cover. . Officer Phillips claims on appeal that the videotape shows him having to jump out of the way when Latits drove backwards after colliding with Officer Jaklic’s car. The video instead shows that as Latits reversed, Phillips Was to the side of Latits’s car. , At deposition, Phillips recalled firing one volley of only four shots. . We need not address the parties’ arguments about a potential second volley of shots. Whether Officer Phillips fired the seven bullets in one or two volleys, all shots were fired within a few seconds of one another and at a time when the situation was the same for purposes of this reasonableness analysis (La-tits’s car had already passed Officer Phillips and was moving away from all officers on the scene). . While Hermiz itself is not controlling authority as an unpublished case, Sigley and Cupp, the cases that established the caselaw cited in Hermiz, are controlling. . The dissent also raises Kirby v. Duva, 530 F.3d 475 (6th Cir. 2008), but that case, too, is materially distinguishable. There, the driver voluntarily pulled over in response to police sirens, and the court concluded that at the time he was shot, no one was in danger and his car was "blocked in.” Id. at 482. .Because we affirm the grant of summary judgment and the case will be dismissed, we need not address the parties' arguments regarding discovery and punitive damages.