NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0126n.06

Case No. 20-1790

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| E.W.; RONNITA BRYANT, Guardian of E.W., | ) | **FILED** |
|  | ) | Mar 21, 2022 |
|     Plaintiffs-Appellees, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE EASTERN |
| DETROIT PUBLIC SCHOOL DISTRICT, et al., | ) | DISTRICT OF MICHIGAN |
|  | ) |  |
|     Defendants, | ) |  |
|  | ) |  |
| BROADUS WILKINS; MYRON MONTGOMERY, | ) |  |
|  | ) | **O P I N I O N** |
|     Defendants-Appellants. | ) |  |
|  | ) |  |
|  | ) |  |

Before: McKEAGUE, BUSH, and READLER, Circuit Judges.

**McKEAGUE, Circuit Judge.** Defendants Montgomery and Wilkins appeal the denial of qualified immunity in this § 1983 case. Plaintiff E.W., a high school freshman at the time of the incident, claims that Assistant Principal Montgomery used excessive force when he forcibly removed E.W. from the school building, threw E.W. to the ground, and pressed his knee into E.W.'s chest. He also claims that Detroit Public School Officer Wilkins swung his arm at E.W.'s face, dislocating and breaking his jaw. The district court found that material questions of fact precluded summary judgment, analyzing Montgomery's actions under the Fourteenth Amendment and Wilkins's actions under the Fourth Amendment. We agree and AFFIRM.

I.

At the summary judgment stage, we review the facts in the light most favorable to the nonmovant. *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017). When events are captured on video, "[t]o the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). In this case, the incident between E.W. and Defendant Myron Montgomery was captured by three video cameras. No recording is available of the incident between E.W. and Defendant Broadus Wilkins.[1]

When these events took place, E.W. was in the first few months of his freshman year at West Side Academy high school. He was a skinny 14-year-old, standing 5′3″. Defendant Montgomery was the assistant principal of the school and Defendant Wilkins was a school police officer. Montgomery was around 5′10″ tall, Wilkins, 5′8″; each weighed roughly 230 pounds.

A. Confrontation with Montgomery

On October 9, 2017, E.W. left his wallet with a teacher while he played basketball after school. After making it to the bus stop to go home, he realized he forgot the wallet. He needed his money to make it home from school. E.W. walked back to school intending to retrieve his wallet from either the teacher or the principal. He reentered the school building from the side door and was confronted by Montgomery. E.W. alleges Montgomery yelled at him to leave. E.W. didn't tell Montgomery that he was looking for his wallet because, in his words, Montgomery was acting "hostile and angry." R. 53-2, PageID 571. E.W. left the building on Montgomery's command but reentered from the rear door.

---

[1] One recording skips forward eleven seconds. E.W. alleges that the incident between E.W. and Wilkins occurred during those missing seconds. Defendants explain this anomaly as the possible result of a lack of movement in front of the motion-sensitive cameras.

Montgomery met E.W. at the rear door. This portion of events was captured on camera. E.W. told Montgomery he needed to retrieve his wallet so that he could get home. E.W. alleges that Montgomery did not listen to him, and instead told him to leave within three seconds and began counting down. On the video, an increasingly agitated E.W. is shown speaking to Montgomery. After some dialogue, Montgomery threw down a pile of papers he was holding and got in E.W.'s face. When E.W. still did not leave, Montgomery grabbed E.W. and pushed him through the school doors. As the video shows, Montgomery pushed E.W. out of the building, pushing E.W. back on his heels through two sets of doors. Outdoors, E.W. contends that Montgomery slammed E.W. to the pavement. Montgomery then held his knee on E.W.'s chest for around five seconds. Montgomery then got off of E.W. and went back inside.

Montgomery's account of the events differs somewhat from E.W.'s. Montgomery claims that he told E.W. specifically upon E.W.'s first entry through the side door that he needed to reenter through the student entrance at the front door and go through the metal detectors per school policy. Montgomery claims he told E.W. to leave because he was in the building illegally. When E.W. didn't leave, he "escorted" E.W. out of the building. R. 53-3, PageID 642. Montgomery testified that he did not slam E.W. but that both fell to the ground together "[a]s a result of our tussle." *Id.* at PageID 643. He also claims that he pinned E.W. to the ground with his knee in an effort to restrain him. Montgomery then walked back into the building to his office, stating a need to "separate" from the situation.

Wilkins also testified to Montgomery's interactions and the immediate aftermath. He had witnessed Montgomery confront E.W. when E.W. first entered the building, and heard E.W. swear at Montgomery. Later, Wilkins heard Montgomery yelling and counting down from three, and witnessed Montgomery push E.W. out of the building. Wilkins testified that he did not see E.W.

try to assault or injure Montgomery. Wilkins testified that he walked towards the rear door and saw a Securitas private security officer picking up E.W. and trying to calm E.W. down. E.W. was, at this point, cursing and ranting, while Montgomery walked back inside.

## B. Confrontation with Wilkins

E.W. got himself off the ground as Wilkins and other people approached. The video shows several individuals walking outside to speak with E.W., who from one angle can be seen to be agitated. The video shows Wilkins walk out of the school to speak with E.W.

E.W. testified that Wilkins walked over to him and said "get away from the school." R. 53-2, PageID 548. E.W. testified that Wilkins then swung his left arm, held straight, at E.W., hitting him in the face with his forearm.

Wilkins, for his part, claims that he turned to walk inside when he saw E.W. start to run at the door. At that point, Wilkins turned and put his left arm straight out, and E.W. ran into his arm. Wilkins did not testify that E.W. was trying to threaten or attack him but was instead trying to run past him.

## C. E.W.'s Injuries

E.W. was picked up by his mother and taken to the emergency room. The contact between Wilkins's forearm and E.W.'s face left him with a broken and dislocated jaw. E.W. testified that he also experienced severe pain in his shoulder that prevented him from raising his arm for several months following the incident. He also testified that he has suffered psychological harm, including difficulty trusting police officers and men in general, bad dreams, trouble sleeping, and a loss of dignity.

D.  Procedural History

Ronnita Bryant, E.W.'s guardian, filed this suit on behalf of E.W. against Montgomery; Wilkins; the Detroit Public School District; and Securitas, the private security company.  The suit was originally filed in state court and removed by Defendants.  The claims against Securitas were settled and the claim for *Monell* liability against the Detroit Public School District was dropped voluntarily.  E.W. brought 42 U.S.C. § 1983 claims alleging violations of his Fourth and Fourteenth Amendment rights against Wilkins and Montgomery, in addition to assault and battery and gross negligence claims under state law against both.  Defendants moved for summary judgment.  The district court held a hearing on Defendants' motion.  At the hearing, the court granted the motion as to the state law claims and dismissed those claims without prejudice but denied Defendants' motion as to E.W.'s § 1983 claims.  Defendants filed this interlocutory appeal challenging the denial of qualified immunity.  E.W. moved to dismiss Defendants' appeal, arguing that we lack jurisdiction over the appeal.  A panel of this court denied E.W.'s motion to dismiss, determining that this panel should consider jurisdiction at the conclusion of briefing.  *See E.W. v. Detroit Public Sch.*, No. 20-1790 (6th Cir. Aug. 9, 2021) (order).

II.

We have jurisdiction to hear an interlocutory appeal to review a district court's denial of qualified immunity at summary judgment.  28 U.S.C. § 1291; *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  This review is limited to the extent that such a denial turns on an issue of law.  *Gillispie v. Mia. Twp.*, 18 F.4th 909, 915 (6th Cir. 2021) (quoting *Mitchell*, 472 U.S. at 530).  Because Defendants' appeal considers "the legal question of whether the law was clearly established," we have jurisdiction.  *Gordon v. Bierenga*, 20 F.4th 1077, 1081 (6th Cir. 2021).

This court reviews a district court's denial of summary judgment de novo, reviewing facts in the light most favorable to the nonmovant. *Foster v. Patrick*, 806 F.3d 883, 886 (6th Cir. 2015) (citation omitted). Summary judgment is only appropriate if the record shows that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

III.

Both Montgomery and Wilkins appeal the denial of qualified immunity. Public officials, like Defendants here, are immune from liability under 42 U.S.C. § 1983 unless the plaintiff establishes both (1) a violation of a constitutional right, and (2) that "the right at issue was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). We may decide the prongs in either order. *Pearson*, 555 U.S. at 236. Qualified immunity is analyzed separately for each defendant. *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020).

A.  Officer Wilkins

We begin with E.W.'s claim against Officer Wilkins for excessive force in violation of the Fourth Amendment.

The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive force by law enforcement officers. *Latits*, 878 F.3d at 547 (citing *Godawa*, 798 F.3d at 463). The Fourth Amendment requires that the amount of force used to effectuate a seizure be "objectively reasonable" under the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The court considers the situation at the moment force is used, "judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

While this inquiry into the totality of the circumstances is wide-ranging, three factors are particularly important: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* We have held that these standards govern the use of force by a police officer in the school setting. *See, e.g.*, *Williams v. Morgan*, 652 F. App'x 365, 374 (6th Cir. 2016) (applying *Graham* factors to conclude a school resource officer used excessive force by breaking a student's arm in response to the student's misbehavior).

Taking the facts in the light most favorable to E.W. as we must, all of those factors suggest that Wilkins's use of force against E.W. was unreasonable. Wilkins had witnessed E.W. twice violate a school rule regarding which door to enter. He did not suspect E.W. of any crime. The first factor "thus cuts against a finding of justified use of force because there was no probable cause that [E.W.] had committed any crime at all" before Wilkins applied force. *Wright*, 962 F.3d at 867.

Second, on E.W.'s version of the facts, he posed no threat to Wilkins or others. There were multiple security officers present, and Wilkins was an adult man significantly larger than E.W. Wilkins himself testified that he never saw E.W. strike or threaten Montgomery. Neither E.W.'s nor Wilkins's version of events suggests that E.W. took any action to indicate that he wanted to strike or threaten Wilkins. Thus, on E.W.'s version of the facts, he posed no threat.

Third, material disputes of fact exist as to whether E.W. was resisting at the time of Wilkins's use of force. On E.W.'s account, he was standing still and was outside the school doors when Wilkins confronted him. Wilkins contends that E.W. verbally resisted Wilkins and that E.W.

was running at the school doors when he was struck. But because we must take the facts in the light most favorable to E.W., we must conclude that E.W. was not resisting when Wilkins struck E.W.

Taken together, on E.W.'s version of the facts, Wilkins's use of force was unreasonable in violation of the Fourth Amendment. E.W. was not suspected of any serious crime, was not posing a threat at the time he was struck and was not resisting arrest. On those facts, Wilkins's striking E.W. with such force as to break his jaw is gratuitous violence amounting to unreasonably excessive force under the Fourth Amendment. *See Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009) (use of force was unreasonable as applied to nonresistant arrestee suspected of a minor crime).

E.W.'s right to be free from such violence was also clearly established at the time of Wilkins's actions. A defendant is entitled to qualified immunity "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate," though there does not need to be "a case directly on point." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).

On E.W.'s facts, he was not resisting (or indeed under) arrest, did not pose a threat to Wilkins or anyone else, and was not suspected of a crime when Wilkins swung at E.W. and broke his jaw. Thus, a reasonable officer in Wilkins's position would have been on notice that he was violating E.W.'s Fourth Amendment rights. We very recently held that "[w]ell before [June 2016], our precedent had 'clearly establish[ed] the right of people who pose no safety risk to the police to

be free from gratuitous violence during arrest.'" *Gambrel v. Knox Cnty.*, 25 F.4th 391, 403 (6th Cir. Feb. 8, 2022) (quoting *Shreve v. Jessamine Cnty. Fiscal Ct.*, 452 F.3d 681, 688 (6th Cir. 2006)).

Wilkins urges us to weigh the facts differently. He asks us to consider E.W.'s purported verbal resistance as the sort of active resistance to arrest that might justify his use of force. He also quibbles with the district court's characterization of his straight-armed forearm strike as a "punch," and disputes the accusation that he swung at E.W. But this account is disputed by E.W.'s version of the facts, and we must view these facts in the light most favorable to E.W. These factual disputes are for a jury to resolve, not for us to consider on interlocutory appeal.

## B. Assistant Principal Montgomery

E.W. also claims that Montgomery's use of force violated his clearly established constitutional rights. The district court determined that material questions of fact precluded summary judgment as to whether Montgomery violated E.W.'s substantive due process rights under the Fourteenth Amendment. *See E.W. v. Detroit Public Sch.*, No. 18-12964, 2021 WL 3089380 at *5 (E.D. Mich. July 22, 2021). We agree.

We have held that the Fourteenth Amendment's due process rights provide public school students with the right "to be free of state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience." *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987) (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980)). In evaluating claims that a teacher or school administrator's actions violated that right, we apply a test "asking four guiding questions: (1) 'Was there a pedagogical justification for the use of force?' (2) 'Was the force utilized excessive to meet the legitimate objective in this situation?' (3) 'Was the force applied in a good-faith effort to maintain or restore discipline or

maliciously and sadistically for the very purpose of causing harm?' And (4) 'Was there a serious injury?'" *Gohl v. Livonia Pub. Sch. Dist.*, 836 F.3d 672, 678–79 (6th Cir. 2016) (quoting *Domingo v. Kowalski*, 810 F.3d 403, 411 (6th Cir. 2016)).

In this case, material questions of fact preclude summary judgment as to each question. A reasonable jury could conclude that Montgomery had little pedagogical justification for his actions. Montgomery himself stated that he sought to "restrain" E.W. and remove him from the school building because he was there "illegally." R. 53-3, PageID 629, 644.

To be sure, school "administrators" have a "substantial interest . . . in maintaining discipline in the classroom and on school grounds," and such an interest does not fully abate after the school day has concluded. *New Jersey v. T.L.O.*, 469 U.S. 325, 339 (1985). And such an interest may have justified removing E.W. from the school building. But E.W. alleged that Montgomery not only removed E.W. from the building but proceeded to slam him to the ground and press his knee into E.W.'s chest. Taking the facts in the light most favorable to E.W., Montgomery used an excessive amount of force to accomplish his interest.

A reasonable jury could also conclude that Montgomery did not act in good faith. In addition to allegedly throwing E.W. to the ground and pressing his knee into E.W.'s chest, E.W. testified that Montgomery was angry and hostile. A jury could conclude that Montgomery acted principally out of anger or malice, rather than through any good-faith desire to secure the school building. *See Webb*, 828 F.2d at 1158.

Finally, material questions of fact pervade as to serious injury. We have suggested that a claim of malicious force by a school administrator, delivered without pedagogical purpose, can survive summary judgment without a showing of injury. *Domingo*, 81 F.3d at 416 (citing *Webb*, 828 F.2d at 1154). But E.W. has also put forward evidence of injury to his shoulders, potentially

attributable to Montgomery's actions. E.W. has also shown evidence of lasting psychological harm. Together, a reasonable jury could find that E.W. suffered a serious injury.

Of course, a reasonable jury could decide these facts differently. The parties dispute whether E.W. was thrown to the ground. E.W. maintains he was slammed; Montgomery says that as a "result of [their] tussle" they "both went to the ground." R. 53-3, PID 643. The video does not definitively rule out either possibility. *Cf. Scott*, 550 U.S. at 378 ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him."). If E.W. was not slammed to the ground and Montgomery had not used gratuitous force in removing E.W. from the school, Montgomery's actions would not be violative of E.W.'s Fourteenth Amendment rights. But because the record is disputed as to this fact, this question is for the jury to decide.

*Webb v. McCollough* clearly establishes the law in this case. 828 F.2d at 1158–59. In *Webb*, we held that a school principal violated a student's constitutional rights when he grabbed a student, threw her against the wall and slapped her during a school field trip. *Id.* at 1158. In that case, we found that the principal's use of force, undertaken outside "the school context," could not be interpreted as disciplinary but rather "arose . . . in anger or from malice." *Id.* at 1158–59. On E.W.'s version of the facts, a reasonable official in Montgomery's position would have been on notice that his actions were constitutionally violative.

IV.

Defendants also contend that the district court erred in granting their motion for summary judgment as to E.W.'s state law claims. The district court dismissed E.W.'s state law claims without prejudice, declining supplemental jurisdiction under 28 U.S.C. § 1367(a). *E.W.*, 2021 WL 3089380, at *1. On interlocutory appeal, in addition to considering federal law qualified

immunity, we have jurisdiction to review the determination of governmental immunity on Michigan state law claims. *Rudolph v. Babinec*, 939 F.3d 742, 753 (6th Cir. 2020). But such jurisdiction is limited to exactly that: we may only consider the appeal of "an order granting or denying governmental immunity under M.C.L. § 691.1407." *Smith v. City of Lenawee*, 600 F.3d 686, 689 (6th Cir. 2010). The district court's order is neither. We thus lack jurisdiction to consider this portion of Defendants' appeal.

V.

Because material factual disputes preclude summary judgment in Defendants' favor, we AFFIRM the district court's denial of summary judgment.