RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0282p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

NITA GORDON, Personal Representative of the Estate
of Antonio Gordon,

*Plaintiff-Appellee*,

*v.*

KEITH BIERENGA,

*Defendant-Appellant*.

⎤
⎟
⎟
⎟
⎟
⎟  No. 20-2013
⎟
⎟
⎟
⎟
⎦

Appeal from the United States District Court for the Eastern District of Michigan at Ann Arbor.
No. 5:18-cv-13834—Judith E. Levy, District Judge.

Argued:  October 21, 2021

Decided and Filed:  December 14, 2021

Before:  McKEAGUE, NALBANDIAN, and MURPHY, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Kali M. L. Henderson, SEWARD HENDERSON PLLC, Royal Oak, Michigan, for
Appellant.  Kenneth D. Finegood, KENNETH D. FINEGOOD, P.L.C., Southfield, Michigan, for
Appellee.  **ON BRIEF:**  Kali M. L. Henderson, T. Joseph Seward, SEWARD HENDERSON
PLLC, Royal Oak, Michigan, for Appellant.  Kenneth D. Finegood, KENNETH D. FINEGOOD,
P.L.C., Southfield, Michigan, for Appellee.

---

**OPINION**

---

McKEAGUE, Circuit Judge.    This case arises out of the fatal police shooting of Antonino[1] Gordon in a drive-thru line as Gordon attempted to flee from Defendant Police Officer Keith Bierenga.    Gordon's estate brought this action under 42 U.S.C. § 1983 against Bierenga alleging excessive use of force.    Bierenga moved for summary judgment, asserting the defense of qualified immunity.    The district court denied qualified immunity at summary judgment, holding that Bierenga violated Gordon's Fourth Amendment rights when viewing the facts in the light most favorable to the estate, and that the violation was "clearly established" by our decision in *Latits v. Phillips*, 878 F.3d 541 (6th Cir. 2017).    While *Latits* is similar in some ways, we do not think *Latits* is similar enough to the facts of this case to pass muster under the controlling standards for defining "clearly established" law.    Because the estate is unable to point to a case that would place every reasonable officer in Bierenga's position on notice that his use of force in this specific situation was unlawful, we must reverse the district court's denial of qualified immunity.

I.

**A.  Facts**

The pertinent events here were recorded by the dash cam of Defendant Police Officer Keith Bierenga's police vehicle and the surveillance system at the White Castle where the fatal shooting occurred.    When video evidence exists on an appeal in a qualified immunity case, we view the facts "in the light depicted by the videos."    *Latits*, 878 F.3d at 547(citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).    If the facts shown on video "can be interpreted in multiple ways or if [the] videos do not show all relevant facts," we view those facts in the light most favorable to the non-moving party.    *Id.* (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)).

---

[1]Although listed on the case caption as "Antonio," records show that the decedent's name is spelled "Antonino."

### 1.  Initial Traffic Stop and Vehicular Flight

Around 6:00 p.m. on April 10, 2018, Bierenga turned left onto 13 Mile Road out of a residential neighborhood in Royal Oak, Michigan.  He then witnessed a BMW driven by decedent Antonino Gordon merge quickly from the center turn lane into a westbound lane, forcing an oncoming car in this lane to quickly slow to avoid a collision.  Bierenga then attempted to initiate a traffic stop.  He pursued Gordon for a couple of blocks with police lights activated.  Dash cam video shows many cars traveling down 13 Mile Road as Bierenga and Gordon drove by houses and apartment buildings on either side of the road.  After failing to pull over for several blocks, Gordon came upon a red light at a busy intersection surrounded by businesses and restaurants.  He stopped his car behind several cars waiting at the light, with Bierenga directly behind him.  Bierenga then exited his cruiser, approached Gordon's car, and began speaking to him through the driver's window.  Bierenga testified that, through Gordon's partially open window, he perceived that Gordon's skin was pale, his eyes were glassy, and that he was exhibiting signs of being under the influence of something.

Bierenga spoke to Gordon for approximately ten seconds at the driver's side of Gordon's vehicle while the traffic light remained red.  When the light turned green and the traffic ahead of him moved forward, Gordon accelerated away from Bierenga.  Bierenga then ran back to his car and told dispatch that the driver fled.  Dash cam video shows Gordon turning from the westbound lane into the center turn lane and braking.  From the turn lane, Gordon then made a sharp left turn in front of oncoming traffic into a White Castle parking lot, causing the oncoming vehicles to brake.  On the dash cam, Gordon can be seen turning left into the parking lot, opposite the designated flow of the drive-thru, and accelerating out of frame as if to drive the wrong way around the parking lot.  Bierenga, at this point back in his police car, followed Gordon into the White Castle parking lot.  Bierenga circled the parking lot once but could not find Gordon.  He then drove through the streets immediately surrounding the White Castle.  Bierenga's dash cam showed heavy traffic on either side of the White Castle parking lot.  He did not immediately locate Gordon.

## 2. Shooting at White Castle

After losing track of Gordon, Bierenga provided dispatch with a physical description of Gordon and a description of the make and color of Gordon's car. Approximately fifteen minutes later, Bierenga spotted a BMW in line at the White Castle drive-thru that looked like Gordon's. At this time, Gordon was at the drive-thru window paying for his order. Another car was parked in line about three feet behind him.

The following events are visible on the White Castle drive-thru surveillance camera located inside the kitchen pointing toward the window. At approximately 6:24 p.m., Gordon can be seen pulling into the White Castle drive-thru window. During this time, Gordon engaged in a transaction with the cashier and appeared to be acting normally. The video is not clear enough to see whether Gordon is exhibiting signs of intoxication.

A few seconds after Gordon handed money to the cashier, Bierenga pulled into the White Castle and parked at a diagonal angle directly in front of Gordon's BMW, leaving a few feet between the two cars. The angle at which Bierenga pulled in effectively blocked Gordon's car in between Bierenga's car and the car behind Gordon in the drive-thru line. Bierenga exited his vehicle and walked toward the passenger side of Gordon's vehicle, with Gordon watching him. Bierenga then walked back around to the front of Gordon's car with his weapon drawn, in the few feet of space between his vehicle and Gordon's car.

As Bierenga walked back directly in front of Gordon's car, Gordon looked back over his right shoulder and reversed his car quickly. Gordon's car jolted as it bumped the car behind him in the drive thru. Bierenga positioned himself between the front of Gordon's car and the driver-side rear door of his police vehicle. Gordon then began to accelerate forward with his wheels turned toward the rear of Bierenga's vehicle. As Gordon started driving forward toward Bierenga, Bierenga moved to his right and out of the direct path of Gordon's vehicle. Bierenga can be heard repeatedly yelling, "stop!" as Gordon moved forward. The front of Gordon's car then crashed into the back left wheel of Bierenga's car while Bierenga stood to the driver's side of Gordon's car—stuck between Gordon's car, his police car, and the White Castle wall.

Gordon then began to back up again as if to complete a three-point turn to maneuver around Bierenga's vehicle. He positioned the front of his car toward the opening behind Bierenga's vehicle. Bierenga then walked directly up to Gordon's rolled-down driver window, his left foot level with the driver door, pointing his gun directly at Gordon. Gordon backed up several feet more and turned his wheels to the right, away from Bierenga. As Gordon backed up, Bierenga stayed to the side of the vehicle and walked closer to Gordon's driver's side window with his gun pointed. Gordon then pulled forward, heading away from the White Castle and toward the opening behind Bierenga's vehicle to flee around it. As Gordon accelerated forward, Bierenga yelled "stop" and fired four shots at Gordon through the driver's side of the car.

Bierenga's dash cam captured Gordon's car driving around the White Castle and toward the street after he was shot. Once Gordon drove around Bierenga's car, Bierenga got back in his vehicle and followed Gordon out of the White Castle and onto the street, headed back toward the direction of the original traffic stop. As Bierenga followed, Gordon picked up speed and then began to slow down after a block. Gordon then presumably began to lose consciousness, drifted across the center lane, and crashed into a car travelling the opposite direction. Gordon was subsequently transported to the hospital, where he died. Gordon suffered two gunshot wounds, one to his left arm and chest and another to his right arm. Gordon's toxicology report indicated that he had a blood alcohol content of .27 at the time of death. Bierenga testified that he shot Gordon "to stop [him] from hitting and killing me or hurting me," and that he believed he was "in direct line of harm at the time that [Bierenga] discharged [his] gun." R. 58-3, PageID 848.

**B. Procedural Background**

Plaintiff Nita Gordon, Personal Representative of the Estate of Antonino Gordon, brought a claim for excessive use of force against Bierenga under 42 U.S.C. § 1983. The estate also brought a claim of municipal liability against the City of Royal Oak, which the district court dismissed in May of 2019. Bierenga moved for summary judgment asserting the defense of qualified immunity. The district court denied Bierenga's motion. The district court held that Bierenga's use of deadly force violated Gordon's right to be free from excessive force during his vehicular flight, and that this right was clearly established through our decision in *Latits*. Bierenga now appeals.

II.

A.

We have jurisdiction to review a district court's denial of qualified immunity.  28 U.S.C. § 1291; *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  But our review is limited to "only purely legal questions."  *McGrew v. Duncan*, 937 F.3d 664, 669 (6th Cir. 2019).  Because this appeal turns on the legal question of whether the law was clearly established, we have jurisdiction over the appeal.

B.

We review a district court's denial of summary judgment based on qualified immunity de novo, viewing the facts in the light most favorable to the non-movant.  *Foster v. Patrick*, 806 F.3d 883, 886 (6th Cir. 2015).  Under the familiar test for qualified immunity, a public official is immune from suit unless the plaintiff establishes: (1) a constitutional violation; and (2) that the right at issue was "clearly established" when the event occurred.  *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  Both prongs must be met "for the case to go to a factfinder to decide if [the] officer's conduct in the particular circumstances violated a plaintiff's clearly established constitutional rights.  If either one is not satisfied, qualified immunity will shield the officer from civil damages."  *Id.* (citing *Pearson*, 555 U.S. at 236).

Here, we begin and end with the second prong.  Even when a defendant violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity unless the right at issue was "clearly established[.]"  *Id.* (citing *Pearson*, 555 U.S. at 232).  "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).  A case "directly on point" is not required, but "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).  The inquiry depends on the specific facts of the case and their similarity to caselaw in existence at the time of the alleged violation.  *Id.*  Such specificity is "especially important" in the Fourth Amendment

excessive force context, because "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* (quoting *Mullenix*, 577 U.S. at 12).

Supreme Court precedent sets out general standards governing the bounds of excessive force. Under *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), deadly force may not be used unless an "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]" Under *Graham v. Connor*, 490 U.S. 386, 396 (1989), whether an officer has used excessive force depends on "the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."

However, outside of the "obvious case," general principles established in *Garner* and *Graham* cannot clearly establish the law. *Rivas-Villegas*, 142 S. Ct. at 8 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). "[P]olice officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Mullenix*, 577 U.S. at 13).

In this case, although it is a close call, no existing precedent "'squarely governs' the specific facts at issue." *Id.* (citation omitted). The "critical question" in cases involving use of deadly force during vehicular flight is "whether the officer has 'reason to believe that the [fleeing] car presents an imminent danger' to 'officers and members of the public in the area.'" *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014) (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)). Deadly force is justified against "a driver who objectively appears ready to drive into an officer or bystander with his car." *Id.* (quoting *Hermiz v. City of Southfield*, 484 F. App'x 13, 16 (6th Cir. 2012) (citing *Brosseau*, 543 U.S. at 197–200)). Deadly force is generally not justified "once the car moves away, leaving the officer and bystanders in a position of safety[,]" but an officer may "continue to fire at a fleeing vehicle even when no one is in the vehicle's direct path when 'the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car.'" *Id.* (quoting *Hermiz*, 484 F. App'x at 16); *Scott v. Clay County*, 205 F.3d 867, 877 (6th Cir. 2000); *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir.

1992).  Thus, in evaluating the reasonableness of deadly force in the context of a fleeing driver, we must look both to whether anyone was in the car's immediate path at the time of the shooting and to the officer's prior interactions with the driver that show potential for "imminent danger to other officers or members of the public in the area" if the driver is permitted to continue fleeing. *Latits*, 878 F.3d at 549.

We have held, in several cases, "that deadly force was objectively unreasonable when the officer was to the side of the moving car or the car had already passed by him—taking the officer out of harm's way—when the officer shot the driver." *Id.* (citing *Godawa*, 798 F.3d at 466–67; *Hermiz*, 484 F. App'x at 16; *Sigley v. City of Parma Heights*, 437 F.3d 527, 531, 537 (6th Cir. 2006); *Cupp*, 430 F.3d at 774–75).  However, none of those cases contained facts similar enough to this case such that "*every* reasonable official" in Bierenga's position would have been on notice that his conduct violated Gordon's Fourth Amendment rights.  *Mullenix*, 577 U.S. at 11 (emphasis added) (citation omitted).

The estate relies primarily on our decision in *Latits*.  In that case, an officer pulled over a driver after midnight for turning the wrong way onto a road.  878 F.3d at 544.  When the officer approached the car and asked the suspect for his license and registration, he saw the driver attempt to hide bags of suspected narcotics.  *Id.*  After the officer asked the driver to step out of the car, the driver fled.  *Id.*  He then led officers on a chase travelling at about 60 miles per hour on a ten-lane divided highway with no other vehicles around.  *Id.* at 544–45, 549.  Eventually, the defendant officer rammed the driver's vehicle off the road and into the grass.  *Id.* at 545–46. When the driver's car stopped in the grass, he began to drive slowly toward an opening between two officers' cars and collided head on with another officer's car at low speed.  *Id.* at 546.  The driver then reversed away from the car past the defendant officer, who was now on foot.  *Id.*  As the car passed, the officer shot the driver three times, killing him.  *Id.*

For at least two reasons, we held that the driver "did not present an imminent or ongoing danger and therefore that the shooting was not objectively reasonable." *Id.* at 552.  First, because the officer had fired at the driver's car "after [the] car had passed the point where it could harm him," so the officer "had time to realize he was no longer in immediate danger." *Id.* at 548.  And second, because permitting the driver "to continue to flee instead of shooting him would not have

put the public in imminent danger either." *Id.* at 550. The second reason materially distinguishes this case from *Latits*.

Here, like in *Latits*, the video from the White Castle drive-thru permits an interpretation that Bierenga fired four shots at Gordon after Gordon's car "had passed the point where it could harm him," such that Bierenga "had time to realize he was no longer in immediate danger." *Id.* at 548. But the driver's conduct prior to the moments of the shooting in *Latits* are not close enough to the facts here such that every reasonable officer in Bierenga's position would be on notice that shooting Gordon, rather than permitting Gordon to continue to flee and potentially endanger the public, would violate Gordon's Fourth Amendment rights. *See id.* at 552.

Crucial to our analysis in *Latits* was that the "chase occurred under circumstances in which risk to the public was relatively low." *Id.* at 550. The driver fled, in the dead of night, on "a large, effectively empty highway surrounded by non-populated areas (a cemetery and vacant state fairgrounds), passing no pedestrians, cyclists, or motorists besides the police trailing him." *Id.* Furthermore, the driver in *Latits* "had shown no intention or willingness to drive recklessly through residential neighborhoods." *Id.*

The circumstances of Gordon's flight are different. Gordon fled from Bierenga during rush hour in the middle of a major road in a populated Detroit suburb, adjacent to residential neighborhoods and businesses. Bierenga observed Gordon make a reckless left turn in the face of oncoming traffic near a busy intersection to escape from Bierenga, causing oncoming cars to brake to avoid colliding with Gordon as he turned into the White Castle parking lot. Several cars were parked in the parking lot. Multiple patrons and employees were inside. What's more, after Bierenga later blocked in Gordon at the drive-thru window, Gordon reversed into the occupied vehicle behind him before accelerating forward and hitting Bierenga's police vehicle. Although Gordon's contact with those vehicles occurred at a relatively low speed, his conduct showed a willingness to strike both police and civilian vehicles to effectuate his escape from police. Given the time and place at which it occurred, Gordon's reckless driving posed a materially higher risk of harm to the surrounding public than the reckless driving in *Latits*. *See id.* at 552. Thus, *Latits* did not "clearly establish" that using lethal force in the specific scenario Bierenga confronted was unconstitutional.

Our earlier cases do not suffice to clearly establish the law either. In *Cupp*, an officer arrested a seemingly intoxicated man for making harassing phone calls and placed him in the back of a cruiser in a parking lot at night. 430 F.3d at 769. The officer then went to speak to a tow truck driver about towing the man's vehicle. *Id.* The man then moved to the front seat of the officer's cruiser and began to drive the cruiser away. *Id.* The officer moved out of the way of the vehicle and fired four shots as the vehicle was passing him, killing the man. *Id.* at 770.

In *Sigley*, officers arranged a controlled buy from a suspected high-level ecstasy dealer in the parking lot of a restaurant. 437 F.3d at 529–30. After the man exchanged drugs with a confidential informant in the parking lot, two unmarked police cars blocked his vehicle in from the front and the back. *Id.* at 530. The officers then exited their vehicles and approached. *Id.* One officer positioned himself at the passenger side, and the other positioned himself in between the front of the man's vehicle and the officer's vehicle. *Id.* The man attempted to flee. *Id.* He backed up far enough to free himself from the block, hitting an officer's hand in the process. *Id.* The man then positioned his vehicle so that he could drive forward and around the officer and the vehicle blocking him in, and did so. *Id.* at 531. The officer shot the suspect in the back through the open driver's side window as the car drove forward. *Id.*

We denied qualified immunity in both cases. *Id.* at 537; *Cupp*, 430 F.3d at 777. We later recognized that *Cupp* and *Sigley* "would inform a reasonable officer that shooting a driver while positioned to the side of his fleeing car violates the Fourth Amendment, *absent some indication suggesting that the driver poses more than a fleeting threat*." *Hermiz*, 484 F. App'x at 17 (emphasis added). In this case, unlike in *Cupp* or *Sigley*, a reasonable officer in Bierenga's position had at least some suggestion that Gordon "pose[d] more than a fleeting threat" to the surrounding public. *Id.* While *Cupp* in *Sigley* are similar to this case in that they "involved officers confronting a car in a parking lot and shooting the non-violent driver as he attempted to initiate flight[,]" *Latits*, 878 F.3d at 553 (emphasis omitted), neither case involved reckless flight from a traffic stop in a crowded area prior to the shooting, or the striking of both civilian and police vehicles in an attempt to flee.

To be sure, Gordon's reckless driving did not demonstrate an "obvious willingness to endanger the public by leading the police on chases at very high speeds and through active

traffic." *Latits*, 878 F.3d at 551; *cf. Plumhoff v. Rickard*, 572 U.S. 765, 769–70 (2014) (driver swerved through traffic at over 100 miles per hour, passing more than two dozen vehicles); *Freland*, 954 F.2d at 344 (driver fled at over 90 miles per hour and crashed into a police car). But that is what makes this such a close case. On one hand, Gordon's reckless flight did not rise to level of that in cases like *Plumhoff* and *Freland*. On the other hand, Gordon's reckless flight posed a materially higher risk to the public than the driver in *Latits*. Thus, stuck on this "hazy border[] between excessive and acceptable force," we cannot say that "existing precedent . . . placed the . . . constitutional question beyond debate." *Rivas-Villegas*, 142 S. Ct. at 7–9 (citations omitted).

In sum, the estate cannot point to a case that meets the requisite level of "specificity" to clearly establish that it was unlawful for Bierenga to shoot Gordon in this factual scenario. *Id.* at 8 (quoting *Mullenix*, 577 U.S. at 12). Thus, Bierenga is entitled to qualified immunity.

## III.

We REVERSE the district court's denial of qualified immunity at summary judgment and REMAND to the district court with instructions to enter judgment in favor of Defendant Keith Bierenga.