NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0152n.06

Case No. 21-1454

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>

MICHELLE REYNOLDS, as Personal Representative
of the Estate of CODY REYNOLDS, Deceased,

     Plaintiff-Appellee,

v.

OFFICER RYAN ADDIS

     Defendant-Appellant.

</td><td>

)
)
)
)
)
)
)
)
)
)
)

</td><td>

**FILED**
Apr 11, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES
DISTRICT COURT FOR
THE EASTERN DISTRICT
OF MICHIGAN

OPINION

</td></tr>
</table>

Before: SUTTON, Chief Judge, CLAY and McKEAGUE, Circuit Judges.

McKEAGUE, J., delivered the opinion of the court in which SUTTON, C.J., joined. CLAY, J. (pp. 13–23), delivered a separate dissenting opinion.

McKEAGUE, Circuit Judge. Officer Ryan Addis of the Royal Oak Police Department fatally shot Cody Reynolds on May 14, 2018. His mother Michelle Reynolds, on behalf of his estate, brought this suit against the City of Royal Oak and Addis under 42 U.S.C. § 1983 and state law, alleging excessive force, assault and battery, and gross negligence. The district court denied qualified immunity at summary judgment to Addis because, taking the facts in the light most favorable to Reynolds, it found that Addis violated Reynolds's Fourth Amendment rights. But because Reynolds is unable to point to a case that would place a reasonable officer in Addis's position on notice that his use of force was unlawful, we must reverse the district court's denial of summary judgment on Reynolds's § 1983 claim. We must also reverse the district court's denial

of summary judgment on Reynolds's state law claims because Reynolds does not offer evidence that Addis acted in bad faith and because Reynolds cannot state a claim for gross negligence under Michigan law.

I.

At the summary judgment stage, we review the facts in the light most favorable to the nonmovant. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). In this case, the events leading up to the shooting were recorded on the dash camera on Defendant Officer Ryan Addis's patrol vehicle. "To the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). But if the video "can be interpreted in multiple ways or if [the] videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Id.* (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)).

Michelle Reynolds called 911 shortly after 3:00 a.m. to report that her 20-year-old son, having possibly taken some drugs, had attacked and stabbed her and her husband. The dispatch relayed the message to all officers that there was a stabbing at 1027 Hoffman. Dispatch told responding officers that the stabbing was between a mother and a son, that "it sounds like the dad was stabbed also in the forehead," and that "the son who is the suspect is in the backyard right now." R. 63-8, PageID 2257–58; R.63-7. Michelle Reynolds told the dispatcher that Cody did not have the knife and had left it in the kitchen; this information was not relayed by dispatch to the responding officers.

Officer Ryan Addis was the first to respond. While he drove down Hudson Avenue, he turned on his spotlight to illuminate a young man walking in the street towards the patrol car. The

man, Cody Reynolds, was wearing socks, sweatpants and a long-sleeve shirt. His hands were empty. Addis later described him as having "had a blank stare on his face." Addis parked, got out of the patrol car, and stood behind the open door on the driver's side, pointing his gun at Cody and directing him to stop walking.

After repeating his command, Cody stopped walking towards Addis. Addis asked if he was "the one who just stabbed somebody." Although Cody's response is inaudible, Addis testified that Cody said "yeah." On the video, he can be seen lowering his head, as if in shame. Addis told Cody at this point to put his hands on his head, but Cody started walking slowly towards Addis again. Addis yelled "Stop!" Cody, looking alert, stopped and put his hands on his head. Addis told him to get on his knees. Cody complied, crouching down and lowering his forehead to the ground, extending his empty hands out in front of him. Cody was positioned a few feet in front of and to the left of Addis's patrol car.

Addis then asked if he had a knife. At this point on the video, rather than answering, Cody shouts inaudibly, leaps up and runs off camera to the left of the patrol car toward the general direction of Addis. Within a little more than a second of Cody leaping, Addis began firing, discharging five shots over a span of two seconds.[1] The shots are audible on the dash cam recording but all occur out of frame, with only the casings visible. Cody collapsed about 25 feet from where he first leapt towards Addis, reaching the opposite curb roughly parallel to the rear bumper of Addis's patrol car.

---

[1] Reynolds states in briefing that the shots occurred over four seconds. *See* Appellee's Br. at 12. But because the video clearly shows the shots occur within two seconds, we take the fact as shown in the video. *See Latits*, 878 F.3d at 547. Based on what is audible in the video, any gap between the shots is minuscule at best.

Cody had collapsed face first with his hands beneath him after being shot. Another officer arrived and the two pulled Cody's hands out from under him, cuffed him, and began CPR. He died of his gunshot wounds later that morning after being taken to the hospital.

The subsequent autopsy revealed that Cody suffered four gunshot wounds. All parties agree that the first shot was to Cody's front, striking his chest and coming to rest between his fifth and sixth rib. Accepting Reynolds's expert testimony, the downward trajectory of the bullet "is consistent with Cody being shot as he was transitioning from a downward to an upright posture and/or leaning forward at the time he sustained the wound." R. 73-8, PageID 7. The shot occurred at a muzzle-to-target distance of greater than three feet. The remaining three shots, including the shot that likely proved fatal, were to Cody's back. None of the wounds showed soot or stippling.

Addis maintains that Cody charged at him and that Addis backpedaled while firing; he was unable to explain how Cody was shot in the back. For purposes of summary judgment, we take the conclusion of the plaintiff's expert regarding Addis's position—that Addis remained in position somewhere behind the drivers' side door and turned to follow Cody's path as he ran.

Plaintiff Michelle Reynolds, personal representative of the Estate of Cody Reynolds, brought this suit following the death of her son. She brought a claim for excessive use of force in violation of the Fourth Amendment against Addis under 42 U.S.C. § 1983 and claims of assault and battery and gross negligence under Michigan law. She also brought a claim of municipal liability against the City of Royal Oak. Defendants moved for summary judgment. Defendants asserted the defense of qualified immunity to Reynolds's § 1983 claim and asserted state law governmental immunity to her assault and battery claim. Defendants also argued that Reynolds could not state a claim for gross negligence. Finally, Defendants asserted that Reynolds was not entitled to relief under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). The district court

granted in part and denied in part Defendants' motion. The district court granted summary judgment on Reynolds's claim for municipal liability but denied summary judgment on Reynolds's § 1983 claim and attendant state law claims, concluding Addis was not entitled to immunity. Addis now appeals.

## II.

### A. § 1983 Claim

We have jurisdiction to review a district court's denial of qualified immunity at summary judgment. 28 U.S.C. § 1291; *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Our review is limited to the extent that such a denial turns on an issue of law. *Gillispie v. Mia. Twp.*, 18 F. 4th 909, 915 (6th Cir. 2021) (quoting *Mitchell*, 472 U.S. at 530). Because this appeal considers "the legal question of whether the law was clearly established," we have jurisdiction to consider this appeal. *Gordon v. Bierenga*, 20 F.4th 1077, 1081 (6th Cir. 2021).

This court reviews a district court's denial of summary judgment de novo, reviewing facts in the light most favorable to the nonmovant. *Foster v. Patrick*, 806 F.3d 883, 886 (6th Cir. 2015) (citation omitted). Summary judgment is only appropriate if the record shows that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A public official is immune from liability under § 1983 unless the plaintiff establishes (1) a constitutional violation and (2) that "the right at issue was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "Both prongs must be met 'for the case to go to a factfinder to decide if [the] officer's conduct in the particular circumstances violated a plaintiff's clearly established

constitutional rights.'" *Gordon*, 20 F.4th at 1082 (quoting *Martin*, 712 F.3d at 957). We may decide the issues in either order. *Pearson*, 555 U.S. at 242.

In this case, we need only address the second prong. Even when an officer violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Although there does not need to be "a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7–8 (2021) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).

"The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive force by law enforcement officers." *Latits*, 878 F.3d at 547 (citing *Godawa*, 798 F.3d at 463). The Fourth Amendment requires that the amount of force used to effectuate an arrest be "objectively reasonable" under the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). We consider the situation at the moment force is used, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

In evaluating the totality of the circumstances, three factors are most critical: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Although all factors are important to the totality-of-the-circumstances inquiry, the use of deadly force requires a threat of serious physical harm to either the officer or others. *Bletz v. Gribble*, 641 F.3d 743, 754 (6th Cir. 2011).

In reviewing an officer's actions, we are mindful of the split-second decisions officers must make in the field. *Davenport v. Causey*, 521 F.3d 544, 552 (6th Cir. 2008). In a case such as this, where an officer discharges multiple shots within a span of two seconds, we consider the volley of shots as a single use of force. *See Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 844 (6th Cir. 2018) (treating two volleys of shots as a single use of force because only one second elapsed between them). To be sure, "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Dickerson v. McClellan*, 101 F.3d 1151, 1162 n.9 (6th Cir. 1996) (quoting *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993)). But we do not require an officer to judge "[w]ithin a few seconds" whether a threat has abated, let alone within the fraction of a second that separated the shots here. *Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir. 2015) (quoting *Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005) (alteration in original).

When considering whether a right is clearly established in the Fourth Amendment context, as the Supreme Court recently reiterated, "specificity is especially important." *Rivas-Villegas*, 142 S. Ct. at 8; *see also City of Tahlequah*, 142 S.Ct. at *11–12. The inquiry into whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). The general standards present in *Graham* and *Tennessee v. Garner*—that deadly force requires that a suspect pose a threat of serious physical harm to an officer or others—are only sufficient to clearly establish law in an "obvious case." *Id.* (citing *Brosseau*, 543 U.S. at 199).

This is not an obvious case. As reflected in the plaintiff's version of the facts and the video, Addis reasonably suspected Cody of stabbing his parents with a knife. When Addis arrived at the scene, he did not know whether Cody was still armed with the knife. Addis, with his weapon

drawn, gave several commands to Cody. Cody failed to comply with those commands. When Addis asked Cody if he had a knife on him, Cody responded by suddenly leaping up and running toward Addis. Reynolds suggests that Cody leapt to flee Addis. But Cody's subjective intent is not relevant to the inquiry; we are limited to the information available to a reasonable officer in Addis's position. *Graham*, 490 U.S. at 396; *Mullins*, 805 F.3d at 765–66. From Addis's position, Cody leapt up and moved towards Addis—confirmed by the uncontroverted evidence that Addis's first shot struck Cody to his front, not at a lateral angle. It thus would not have been obvious to a reasonable officer that, in the decisive moment, Cody posed no threat of harm. *Cf. Zulock v. Shures*, 441 F. App'x 294, 302–03 (6th Cir. 2010) (holding that factually identical precedent was not needed to clearly establish a constitutional violation when the plaintiff was shot turning away from an officer, thus posing no threat). Reynolds must therefore "identify a case that put [Addis] on notice that his specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8.

Reynolds points us first to the Eleventh Circuit's decision in *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328 (11th Cir. 1988). But *Samples* cannot clearly establish a violation in this case. To begin with, "out-of-circuit precedent clearly establishes rights only in 'extraordinary case[s]' when the out-of-circuit decisions 'both point unmistakably to the unconstitutionality of the conduct complained of and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct'" was unconstitutional. *Hearring v. Sliwowski*, 712 F.3d 275, 282 (6th Cir. 2013) (quoting *Ohio Civil Service Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988)). In *Samples*, the court held that there was a "serious issue of fact" as to "the question of excessive force" because one of the officer's five shots hit the decedent in the back. *Samples*, 846 F.2d at 1332–33. *Samples* does not, on its own terms, hold any specific conduct unconstitutional. Perhaps more critically, in

*Samples*, there was no forensic evidence to suggest which shot was first—the court had only an autopsy showing a number of shots, one of which was to Samples's back. *Id.* It then relied on the fact that a jury could find that the officer shot Samples first in the back, or shot him as he ran, as precluding summary judgment. *Id.* Here, we know from video and forensic evidence that Addis's first shot hit Cody while they faced each other. We also know that Addis's volley occurred too quickly for us to conclude that Addis had time to decide that any threat had abated, if indeed Cody was fleeing. *Mullins*, 805 F.3d at 767–68. *Samples* does not provide the fair warning needed to avoid qualified immunity.

Reynolds's other authorities also do not establish that Addis's conduct was clearly unlawful. She points to *Bunch v. Village of New Lebanon*, which cited *Samples* in denying summary judgment to an officer. 57 F.3d 1069 (6th Cir. 1995) (table). But in *Bunch*, the plaintiff's forensic evidence disputed the officer's allegations that he shot the plaintiff while they were face-to-face, while the undisputed evidence here is that Cody was head on to Addis when Addis fired.

Reynolds and the dissent also rely on cases where officers fired at automobile drivers while in positions of safety. In *Godawa v. Byrd*, under the plaintiff's version of events, the officer fired on the decedent as he was driving away from the officer. 798 F.3d at 465–66 (6th Cir. 2015). In *Hermiz v. City of Southfield*, evidence suggested that the officer shot at the decedent from the side after the front of the car had already passed the officer. 484 F. App'x 13, 16–17 (6th Cir. 2012). In *Smith v. Cupp*, an officer fired on a previously cooperative suspect who, on the plaintiff's version of the facts, fired into the side of the vehicle the plaintiff drove as it passed the officer. 430 F.3d 766, 774 (6th Cir. 2005). In all three cases, on the plaintiff's versions of the facts, the officer no longer faced a threat from the driver of the vehicle at the time the officer fired his weapon. The same cannot be said here.

Reynolds also points to *Hope v. Pelzer*, 536 U.S. 730 (2002) to argue that we do not need "materially similar" cases to find the law here was clearly established. *See* Appellee's Br. at 60 (quoting *Hope*, 536 U.S. at 739). But we note that *Hope* is an Eighth Amendment case, and the Supreme Court has since repeatedly warned that specificity is especially important in the Fourth Amendment context to clearly establish law for officers. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015). *Hope* does not stand for the proposition that plaintiffs in Fourth Amendment cases do not need to offer any similar cases to demonstrate that an officer should have been on notice that his conduct violated the constitution. The Court did not write on a blank slate when it held that handcuffing an inmate to a hitching post for seven hours in the sun as punishment was clearly established. *Hope*, 536 U.S. at 741–42. Rather, the Court pointed to two prior Circuit decisions reasoning that related conduct—handcuffing prisoners in awkward positions for prolonged periods; denying drinking water to inmates as punishment—violated the Eighth Amendment. *Id.* at 742–43. To be sure, Supreme Court precedent is clear that plaintiffs do not require a case that is "directly on point." *Rivas-Villegas*, 142 S. Ct. at 7 (quoting *White*, 137 S. Ct. at 551). But *Hope* does not excuse Reynolds from needing to offer relevant precedent that shows Addis's conduct violated clearly established law. And Reynolds has not done so.

The dissent argues that we err by requiring too close of a factual match between our precedents and the situation Addis confronted. But the dissent ignores that the Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *City of Tahlequah*, 142 S.Ct. at *11. And the differences between this case and the dissent's cited precedents are not mere pedantry. The dissent would have us rely on cases where we have held an officer violated the Fourth Amendment by shooting from the side or behind a fleeing suspect from a position of safety. *See* Dissent at 8; *Godawa*, 798 F.3d at 466–67; *Cupp*, 430 F.3d at 773–

74. Here, even under Reynolds's facts, the first shot was to Cody's chest as he moved towards Addis. Our precedents that hold that an officer violates the constitution by shooting a fleeing suspect in the back or from a position of safety could not have put Addis on notice that his use of force was constitutionally violative. These cases are "materially distinguishable and thus do[] not govern the facts of this case." *Rivas Villegas*, 142 S.Ct. at 8.

Because "existing precedent has not placed the constitutional question beyond debate," Addis is entitled to qualified immunity on Reynolds's § 1983 claim. *Id.*

### B. Michigan Law Claims

The district court denied Addis state-law immunity on Reynolds's claim of assault and battery. An officer may immediately appeal the denial of Michigan governmental immunity. *Rudolph v. Babinec*, 939 F.3d 742, 753 (6th Cir. 2019). As with the denial of qualified immunity, we review the denial de novo, taking all facts in the light most favorable to Reynolds. Michigan law protects governmental employees from intentional tort liability if (1) the defendant acted within the scope of his employment, (2) "the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature." *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 218 (Mich. 2008).

The parties only dispute whether Addis acted in good faith. This is a subjective element, in contrast to the federal objective test for qualified immunity. *See Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015). "As long as [Addis] can show that he had a good-faith belief that he was acting properly in using deadly force, he is entitled to the protections of governmental immunity regardless of whether he was correct in that belief." *Latits v. Phillips*, 826 N.W.2d 190, 194 (Mich. Ct. App. 2012).

Addis testified that he shot Cody when Cody leapt up because he feared for his physical safety and because Cody may have wrestled Addis's exposed gun from him. In short, he testified

that he shot Cody with a good-faith belief that Cody posed a substantial threat of harm. Reynolds offers no evidence establishing any other motivation for Addis, arguing only that Addis acted unreasonably. However, Michigan governmental immunity does not depend on reasonableness but on Addis's subjective intent. *See Latits*, 826 N.W.2d at 195. Summary judgment was appropriate here.

Reynolds also asserts a claim of gross negligence against Addis. But under Michigan law, "gross negligence is not an independent cause of action when the underlying claim is an intentional shooting of a suspect by an officer." *Presnall v. Huey*, 657 F. App'x 508, 513 (6th Cir. 2016); *see also Miller v. Sanilac Cnty.*, 606 F.3d 240, 254 (6th Cir. 2010). Reynolds's complaint argued that Addis acted negligently by "[d]ischarging his firearm multiple times." R.1 at 9. But Addis intentionally shot Cody. Reynolds has no cause of action for gross negligence.

III.

We REVERSE the district court's denial of summary judgment and REMAND to the district court with instructions to enter judgment in favor of Officer Ryan Addis.

CLAY, Circuit Judge, dissenting. Whether summary judgment is appropriate in this case turns on one question: could a reasonable jury find that Officer Addis used excessive force in violation of the Fourth Amendment and Michigan law when he shot and killed Cody Reynolds after responding to the scene of an alleged stabbing? The record indicates that a reasonable jury could find that Addis' force was excessive. Indeed, the evidence fails to confirm Officer Addis' allegation that he faced a deadly threat when Cody Reynolds got up from his knees and purportedly advanced toward him. (*See* Appellant's Br. 58.) The record instead suggests the possibility that Cody ran *away* from Addis to flee from the scene when he stood up and ran.

This Court has repeatedly held that an officer's use of deadly force is excessive when a suspect with visibly empty hands runs away from a police officer in a way that does not "imperil[] the lives of officers or the public." *Godawa v. Byrd*, 798 F.3d 457, 467 (6th Cir. 2015); *see also Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Smith v. Cupp*, 430 F.3d 766, 769–75 (6th Cir. 2005). Because courts must draw all inferences in favor of Plaintiff at this stage, the district court appropriately denied Defendant's motion for summary judgment on Plaintiff's Fourth Amendment and state law claims.[1] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.") (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)).

---

[1] As a preliminary matter, it is important to emphasize that "[t]his Court's jurisdiction regarding orders denying qualified immunity . . . is narrow." *Harrison v. Ash*, 539 F.3d 510, 517 (6th Cir. 2008). Indeed, appeals may only be taken from final decisions, *Cunningham v. Hamilton Cnty., Ohio*, 527 U.S. 198, 200 (1999), and denials of summary judgment are not final decisions, *DiLuzio v. Vill. Of Yorkville, Ohio*, 796 F.3d 604, 609 (6th Cir. 2015). Accordingly, "to bring an interlocutory appeal of a qualified immunity ruling, the defendant must be willing to concede the plaintiff's version of the facts for purposes of the appeal." *Jefferson v. Lewis*, 594 F.3d 454, 459 (6th Cir. 2010); *see also Ouza v. City of Dearborn Heights, Mich.*, 969 F.3d 265, 276 (6th Cir. 2020).

In this case, Defendant has not "conceded the facts in the light most favorable to [Plaintiff]," meaning that the appeal "falls outside of the narrow jurisdiction of this Court" and should therefore be dismissed. *Harrison*, 539 F.3d at 517; *see infra* pp. 2–6. However, because the majority nevertheless reaches the merits of Defendant's arguments, the dissent will proceed to address the arguments as well.

**I.**

The available video footage shows that Cody Reynolds got up from his knees and ran before Officer Addis shot and killed him. However, the video, along with the rest of the record, fails to resolve three key issues: 1) whether Cody ran at Addis when Addis shot him the first time; 2) whether Cody ran at Addis when Addis shot him a second, third and fourth time; and 3) whether Addis moved and reoriented his gun over the course of the five shots, so that he aimed and shot at Cody's back as Cody ran away from Addis. In regard to these questions, the district court pointed out the following:

> Here, there is a question of material fact for the jury to decide whether Addis was justified in firing all of the shots, including the shots to Mr. Reynolds's back, when he clearly saw Mr. Reynolds had nothing in his hands and did not make any gestures as if he was reaching for a weapon. Although Defendants would like the Court to adopt wholesale Addis's version of the deadly encounter, this is antithetical to Rule 56. Plaintiff has presented evidence calling into question Addis's version of events with Dr. Spitz's findings, the autopsy report, DaFoe's report and the video from Addis' patrol car.

(Op. & Order, R. 92, Page ID # 3616.)

The evidence highlighted by the district court, as well as the remainder of the record, raises genuine and material disputes of fact. First, the expert report from forensic pathologist Dr. Daniel Spitz indicates that Cody was not running at Addis when Addis fired his service weapon. It also indicates that Addis shifted the position of his gun over the course of the shooting so that several of the shots were aimed and fired at Cody's back as Cody ran away from Addis. The report states the following:

> The evidence indicates that after having elevated from a crouched position, Cody moved in a southeasterly direction for a distance of approximately 25 feet. The terminal collapse and Cody's final position was at the south side of the road directly in front of a driveway apron. A large amount of blood was on the road surface in this area. Cody collapsed in a prone position with his head in a southeasterly direction and his feet in a northwesterly direction. With Officer Addis in a standing position next to the driver's side of his police vehicle, the distribution and location

> of the three back wounds indicate that Officer Addis must have turned to his left
> and fired multiple times as Cody ran toward the south side of the road.

(Spitz Report, R. 73-8, Page ID # 2768.)  Addis cannot explain how Cody received three gunshots in his back, and the Court must accept Plaintiff's assertion that Addis remained behind the driver's side door and turned to follow Cody's path as he ran "in a southeasterly direction," as Dr. Spitz concluded.  *See* Majority at 4; (Spitz Report, R. 73-8, Page ID # 2768).  Even though the majority concedes as much, it nevertheless concludes that "Addis's volley occurred too quickly for us to conclude that Addis had time to decide that any threat had abated, if indeed Cody was fleeing." *See id.* at 9.  But even though "we do not require an officer to judge whether a threat has abated" within a "fraction of a second, the Court must consider the totality of circumstances.  *See* Majority at 7 (citing *Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir. 2015)); *see also Garner*, 471 U.S. at 8–9 ("[T]he question [is] whether the totality of the circumstances justified a particular sort of search or seizure.").)

In this case, Addis' shots spanned multiple seconds; the shots were not, in fact, fired "within a fraction of a second."  *See* Majority at 7; *see also Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 843–44 (6th Cir. 2018);  *Dickerson v. McClellan*, 101 F.3d 1151, 1162 n.9 (6th Cir. 1996) (concluding that an officer's gunshots can amount to excessive force even if "it is determined that the officers' initial decision to shoot was reasonable under the circumstances but there was no need to continue shooting") (quoting *Ellis v. Wynalda*, 999 F.2nd 243, 247 (7th Cir. 1993)).  Accordingly, a jury could find that several of Addis' shots amounted to excessive force, particularly where the Plaintiff's version of the facts indicates that Addis fired the second, third and fourth gunshots as Cody was running away from him, rather than at him, at a distance.  (Spitz Report, R. 73-8, Page ID # 2768; Genna Report, R. 63-22, Page ID # 2509).

The photographs from the scene, coupled with the facts raised by the autopsy report, support Dr. Spitz' conclusions and raise questions about the reasonableness of Addis' use of force. Indeed, an aerial picture taken by a drone shows that Cody's body landed approximately four body-lengths away from Addis, at a diagonal angle from the location where Addis stood and initially shot Cody in the upper left chest. A reasonable jury could conclude that after shooting Cody one time in the upper-left torso, Addis indeed "turned to his left and fired multiple times as Cody ran toward the south side of the road." (*See* Spitz Report, R. 73-8, Page ID # 2768.) Additionally, the autopsy report illustrates the location of the bullets that entered Cody's body squarely in the back. (Autopsy Report, R. 63-10, Page ID # 2318.) Both pieces of evidence support Plaintiff's theory that Addis did not face a lethal threat as he fired several, or all, of the shots because Cody did not charge at him.





*Fig. 1 Cody's Location While Kneeling (1), Addis' Location (2), Body (3)*      *Fig. 2 Bullet Entry Points: 1 (left); 2, 3, 4 (right)*

(Drone Photo,[2] R. 63-24, Page ID # 2521 (references added); Autopsy Report, R. 63-10, Page ID # 2318.)

---

[2] These are the approximate locations relevant to the Court's analysis in evaluating Defendants' summary judgment motion. The locations where Cody knelt before running (1), and where his body landed after the shooting (3), are undisputed. (Appellant's Br. 29-32; Appellee's Br. 11–12; *see also* Dash Cam Footage, R. 63-7, 02:35–02:40.) The 25-foot distance between those points is also undisputed. (*See id.*; *see also* Genna Report, R. 63-22, Page ID #

The dash cam footage and the report from Plaintiff's law enforcement expert further add to the genuine and material factual disputes regarding Cody's movements and the reasonableness of Addis' response. The video confirms Addis had a clear view of Cody's empty, unarmed hands before and as Cody got up to run. And the audio raises doubts about the "volley" of Addis' gunshots and the degree to which it "occurred too quickly for us to conclude that Addis had time to decide that any threat had abated." *See* Majority at 7, 9. While the audio demonstrates that the five gunshots were fired over the course of several seconds, it also suggests that there was varied pacing between the first two and last three shots. Specifically, a greater amount of time elapsed between the second and third gunshots as compared to the subsequent three shots. (*See* Dash Cam Footage, R. 63-7 at 02:40–02:42 (evincing a firing sequence that accelerated in a one-one-three pattern).) This evidence would support a reasonable jury's conclusion that shots three through five were all fired once Addis reoriented his gun as Cody ran diagonally away from him, after any imminent danger to the officer had been mitigated by Cody's relative posture (facing away) and increased distance from Addis. *See Dickerson*, 101 F.3d at 1162 n.9. The report submitted by Plaintiff's law enforcement expert, Scott DeFoe, supports this theory. After analyzing the evidence and considering the situation based on his training and experience as a former law enforcement officer, DeFoe found that "Officer Ryan Addis rushed into this situation without any plan of action . . . and failed to consider alternative actions" available to him. (DeFoe Report, R. 73-9, Page ID # 2801.)

---

2510.) Additionally, as the majority states, "[f]or purposes of summary judgment, we take the conclusion of the plaintiff's expert regarding Addis's position—that Addis remained in position somewhere behind the driver's side door and turn to follow Cody's bath as he ran." *See* Majority at 4; (*see also* Appellant's Br. 32 (noting that Plaintiff posits "**and Defendant accepts**" that Addis did not move from his position next to the door of the driver's side of the police car) (emphasis in original).)

Even Defendant's own evidence casts doubt on the reasonableness of Addis' use of force. Forensic Consultant Robert Genna concluded that Cody moved "in a southeasterly direction from the left front corner of the vehicle," rather than an east-bound direction, directly at Addis, when he got up from his knees. Genna also concluded that the blood spatter evidence "demonstrates *continued movement in the original southeast direction* of Cody's body. The final resting place of the body also shows a *continuous unbroken movement of the body along this same path of travel*." (Genna Report, R. 63-22, Page ID # 2512 (emphasis added).) Even though Addis and Cody faced one another while Cody knelt on the ground, these assertions support the theory that Cody got up and immediately fled *to his right* (Addis' left), rather than charging directly at the officer. A jury could thus find that shooting and killing Cody was excessive given these facts, even if the interaction happened over the course of a short period of time. *See Stevens-Rucker*, 739 F. App'x at 843–44; *Dickerson*, 101 F.3d at 1162 n.9; *see also supra* pp. 3–5.

## II.

### a. Plaintiff's Fourth Amendment Claims

Viewing the available facts in the light most favorable to Plaintiff, and under the totality of the circumstances, a reasonable jury could find that Addis' use of deadly force violated Cody's Fourth Amendment rights. *See Garner*, 471 U.S. at 8–9. In this case, the Court need only address whether the constitutional right that Plaintiff asserts was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Martin v. City of Broadview Heights*, 712 F.3d 957 (6th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2002)); *see also* Majority at 5. That is because "[p]ublic officials are entitled to qualified immunity from suits for civil damages if *either* the official's conduct did not violate a constitutional right *or* if that right was not clearly established at the time of the conduct." *Latits v.*

*Philips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Godawa*, 798 F.3d at 463; *Saucier*, 533 U.S. at 201–02) (emphasis added)).

"As a starting point, [Plaintiff] had a clearly established right to be free from excessive force." *Palma v. Johns*, — F. 4th —, No. 21-3315, 2022 WL 594046, at \*16 (6th Cir. Feb. 28, 2022) (citing *Godawa*, 798 F.3d at 463). However, while "this general right  is well known, the right at issue is not defined at such 'a high level of generality.'" *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Rather, the claimed right must be sufficiently particularized so "that a reasonable official would understand that what he is doing violates that right." *Id.*; *Scheffler*, 752 F. App'x at 43 (quoting *Kennedy v. City of Villa Hills*, 635 F.3d 210, 2014 (6th Cir. 2011)). The majority inconsistently defines and incorrectly applies this burden. Indeed, it simultaneously confirms that Plaintiff need not put forth "a case directly on point," *see id.* at 6 (quoting *Rivas-Villegas*, 142 S. Ct. at 7), and also concludes that Plaintiff's argument fails "because Reynolds is unable to point to a case that would place a reasonable officer in Addis's position on notice that his use of force was unlawful," *see id.* at 1.

This raises a critical flaw in the majority's reasoning. To get around the Court's precedent showing that an officer cannot shoot a fleeing suspect whose hands are visibly empty, the majority raises the burden by requiring Plaintiff to cite a prior case that tracks the precise facts of the one now before the Court. *See* Majority at 7–8; *but see Cupp*, 430 F.3d 766, 776-77 (concluding that prior cases can provide clear and fair warning to officers even where "the very action in question has [not] previously been held unlawful") (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This requirement runs roughshod over the caselaw that sets out the "salient question" in regard to this prong of the excessive force analysis: whether the law "at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'"

*Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *see also Palma*, — F. 4th —, 2022 WL 594046, at *16. Indeed, as the Court recently reiterated, "when determining whether a particular right is clearly established, courts 'ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted,'" not whether this Court previously determined that the exact conduct in question amounted to excessive force. *Palma*, — F. 4th —, 2022 WL 594046 at *16 (quoting *Ziglar v. Abbasi*, —U.S.—, 137 S. Ct. 1843, 1867 (2017) (quoting *Saucier*, 533 U.S. at 202)) (internal quotations omitted).

In this case, Plaintiff raised evidence showing that Officer Addis shot and killed Cody Reynolds as Cody attempted to flee from the from the scene while his empty hands were visible to the officer. *See supra* pp. 2–7. Simultaneously, the Court has clearly established that deadly force is constitutionally excessive when a police officer shoots an unarmed suspect that is running away from an officer when neither the officer nor the public is in immediate danger of death or serious injury. *Godawa*, 798 F.3d at 465, 467; *Garner*, 471 U.S. at 11; *Cupp*, 430 F.3d at 775–6 ("It is clearly established constitutional law that an officer cannot shoot a non-dangerous fleeing felon in the back of the head."). And "the 'fact that a situation unfolds quickly does not, by itself, permit officers to use deadly force. Rather, qualified immunity is available only where officers make split-second decisions *in the face of serious physical threats to themselves and others*.'" *Latits*, 878 F.3d at 547 (emphasis added) (quoting *Mullins*, 805 F.3d at 766). Viewing the evidence in the light most favorable to Plaintiff, this Court has clearly established that deadly force is excessive under the circumstances faced by Addis. *See Godawa*, 798 F.3d at 465–67; *Garner*, 471 U.S. at 11; *Cupp*, 430 F.3d at 769–75. Consequently, the district court correctly determined that Plaintiff's claims should survive summary judgment.

### b. Plaintiff's State Law Claims

Additionally, there are genuine and material disputes of fact regarding Plaintiff's claims under Michigan law. As the district court noted, "[u]nder Michigan law, governmental employees are entitled to immunity for their intentional torts if (1) the employee's challenged acts were undertaken in the course of employment, (2) the acts were undertaken in good faith, and (3) the acts were discretionary rather than ministerial." (Op. & Order, R. 92, Page ID # 3621 (citing Mich. Comp. Laws § 691.1407(2)(c)(3)); *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 222–23 (Mich. 2008)).) The parties dispute whether Addis acted in good faith.

Michigan law defines "[a] 'lack of good faith,' which is the sole issue in this claim . . . as 'malicious intent, capricious action or corrupt conduct' or 'willful and corrupt misconduct[.]'" (Op. & Order, R. 92, Page ID # 3621 (citing *Odom*, 760 N.W.2d at 225).) Viewing the record in the light most favorable to Plaintiff, Addis' actions demonstrate that he lacked good faith when he shot and killed Cody as Cody ran away from him unarmed. *See supra* pp. 3–7. Although Addis testified that he shot Cody because he feared for his safety, Addis cannot explain how three shots ultimately entered Cody's back. Furthermore, the record supports a finding that Addis shot Cody in the back after any imminent danger had subsided. *See supra* pp. 3–7. A reasonable jury could thus call into question Addis' credibility and find that he lacked good faith.

There are also genuine and material factual disputes related to Plaintiff's gross negligence claim. Defendant argues that because "there is no tort of assault and battery by gross negligence," and "Plaintiff's allegations in his gross negligence claim are based upon the same set of facts as his intentional tort assault and battery cause of action," the district court was "required" to dismiss Plaintiff's gross negligence claim. (Appellant's Br. 63–64 (citing *VanVorous v. Burmeister*, 687 N.W.3d 132, 143 (2004) ("[P]laintiff's claim of gross negligence is fully premised on her claim of

excessive force. As defendants correctly note, this Court has rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence.")).) But the Court has "sustained gross-negligence claims premised on allegations that officers were 'grossly negligent in failing to follow certain procedures and statutory obligations' or where the plaintiff can otherwise 'show that the defendant owed him a duty of care.'" *Richards v. City of Jackson, Mich.*, 788 F. App'x 324, 336–37 (6th Cir. 2019) (citing *Brent v. Wayne Cnty Dep't of Human Servs.*, 901 F.3d 656, 701 (6th Cir. 2018) ("Plaintiffs are correct to suggest that they may bring common-law negligence claims based on allegations that could also undergird intentional-tort claims . . . .")). Sustaining such a claim is consistent with *VanVorous*, which merely concluded that a plaintiff's gross negligence claim that "*is fully premised*" on her excessive force claim cannot go forward. *VanVorous*, 687 N.W.3d at 143 (emphasis added); *Richards*, 788 F. App'x at 336 ("[P]laintiffs are barred from bringing gross-negligence claims *only if* those claims are 'fully premised' on alleged intentional torts.") (emphasis added) (internal quotations omitted).

> In this case, the district court determined that the discovery process produced the following:

> expert evidence that [Officer] Addis departed from established protocols regarding the use of force and use of deadly force. [The expert] further opined that Addis rushed into the situation without having any plan nor did he employ any de-escalation procedures.

(Op. & Order, R. 92, Page ID # 3622–23; *see also* DeFoe Affidavit, Ex. I, R. 73-9, Page ID # 2792–2846.) Accordingly, Plaintiff's gross negligence claim is not "fully premised" on the alleged intentional torts. *VanVorous*, 687 N.W.3d at 143. The claim is instead based in "breaches of duty identified during the course of discovery," (Compl., R. 1, Page ID # 9), namely, actions allegedly taken contrary to accepted standards and procedures, (Pl.'s Resp., R. 73, Page ID # 2633; 2670–71). Critically, the duty that Plaintiff emphasizes in her gross negligence claim is broader than the "duty implicit in Michigan's immunity standard from intentional torts." (*Compare* Compl., R. 1,

Page ID # 8 *with* Complaint, R. 1, Page ID # 7; *see also id.* (noting that "the *VanVorous* issue is one of duty, not of acts" and "whether there is a separate duty apart from the duty to avoid 'intentional and offensive touching'") (quoting *Bell v. Porter*, 739 F. Supp. 2d 1005, 1015 (W.D. Mich. 2010).)

Because the record raises genuine and material disputes of fact regarding the nature of Addis' conduct when he shot and killed Cody Reynolds, the district court did not err when it denied Defendant's motion for summary judgment as to Plaintiff's state law tort claims.

**III.**

In the summary judgment context, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are *jury functions*, not those of a judge . . . ." *Anderson*, 477 U.S. at 255 (emphasis added). This case presents a variety of material factual disputes in regard to Plaintiff's federal and state law claims. For these reasons, the district court did not err when it denied Defendant's motion for summary judgment.